## UNITED STATES *v.* MORA.

1. The third section of the act of May 20, 1862 (12 Stat. 404), authorized the Secretary of the Treasury to require reasonable security that goods should not be transported in vessels to any place under insurrectionary control, nor in any way be used in giving aid or comfort to the enemy, and to establish such general regulations as he should deem necessary and proper to carry into effect the purposes of the act. *Held,* that a bond taken by the collector of the port of New York, under regulations established by the Secretary of the Treasury, from a shipper and two sureties, in double the value of the goods shipped, to prevent such transportation and use, comes within the reasonable security specified in said third section.

2. The right of the collector to refuse a clearance altogether included that to exact a bond. Such bond, when duly executed, is *prima facie* evidence that it was voluntarily entered into.

3. Where the conditions of a bond which are not sustainable are severable from those which are, the latter hold good *pro tanto,* and evidence to show a breach of them is admissible.

ERROR to the Circuit Court of the United States for the Southern District of New York.

This is a suit by the United States on a bond dated and executed March 4, 1863, exacted by the collector of the port of New York, as a condition precedent to granting a clearance to the vessel " Sarah Marsh," laden with a cargo of merchandise, bound to the port of Matamoras, in Mexico.

To support the issues on its part, the plaintiff proved that on the twenty-third day of May, 1862, the then Secretary of the Treasury had instructed the then collector of customs at the port of New York as follows : —

" TREASURY DEPARTMENT,
" WASHINGTON, D. C., May 23, 1862.

" SIR, — In pursuance of the provisions of the proclamation of the President modifying the blockade of the ports of Beaufort, Port Royal, and New Orleans, and of the regulations of the Secretary of the Treasury relating to trade with those ports, no articles contraband of war will be permitted to enter at either of said ports, and you will accordingly refuse clearance to vessels bound for those ports, or either of them, with any such articles on board.

" Until further instructed, you will regard as contraband of war the following articles; viz., cannons, mortars, fire-arms, pistols, bombs, grenades, fire-locks, flints, matches, powder, saltpetre, balls, bullets,

pikes, swords, sulphur, helmets, or boarding-caps, sword-belts, saddles and bridles (always excepting the quantity of the said articles which may be necessary for the defence of the ships and of those who compose the crew), cartridge-bag material, percussion and other caps, clothing adapted for uniforms, resin, sail-cloth of all kinds, hemp and cordage, masts, ship timber, tar and pitch, ardent spirits, military persons in the service of the enemy, despatches of the enemy, and articles of like character with those specially enumerated.

"You will also refuse clearance to all vessels which (whatever the ostensible destination) are believed by you, on satisfactory ground, to be intended for ports or places in possession or under control of insurgents against the United States; or that there is imminent danger that the goods, wares, and merchandise, of whatever description, laden on such vessels, will fall into the possession or under the control of such insurgents; and in all cases where, in your judgment, there is ground for apprehension that any goods, wares, or merchandise shipped at your port will be used in any way for the aid of the insurgents or the insurrection, you will require substantial security to be given that such goods, wares, or merchandise shall not be transported to any place under insurrectionary control, and shall not, in any way, be used to give aid or comfort to such insurgents.

"You will be especially careful, upon application for clearances, to require bonds with sufficient sureties, conditioned for fulfilling faithfully all the conditions imposed by law or departmental regulations from shippers of the following articles, to the ports opened, or to any other ports from which they may easily be, and are probably intended to be, reshipped in aid of the existing insurrection; namely, liquors of all kinds, coals, iron, lead, copper, tin, brass, telegraphic instruments, wires, porous caps, platina, sulphuric acid, zinc, and all other telegraphic materials, marine engines, screw propellers, paddle-wheels, cylinders, cranks, shafts, boilers, tubes for boilers, fire-bars, and every article, or any other component part of an engine or boiler, or any article whatever which is, can, or may become applicable for the manufacture of marine machinery, or for the armor of vessels.

"I am, &c.,          S. P. CHASE,
"*Sec'ty of the Treasury.*

"HIRAM BARNEY,
"*Coll. of N. York.*"

That the following bond was taken by the said collector of customs, as the condition upon which he had granted a clear-

ance to the "Sarah Marsh" to proceed from the port of New York to the port of Matamoras, in Mexico:—

"Know all men by these presents, that we, Leon Haas, Jr., as principal, and Foster Mora and W. M. Congreve, all residing and owning real estate in the city of New York, are held and firmly bound unto the United States of America in the sum of twenty-one thousand eighty-one $\frac{74}{100}$ ($21,081.74) dollars, lawful money of the United States of America, to be paid to the said United States of America or their assigns, for which payment, well and truly to be made, we bind ourselves, our heirs, executors, and administrators, firmly by these presents; sealed with our seals, dated the fourth day of March, one thousand eight hundred and sixty-three.

"Now, the condition of this obligation is such that if the ship or vessel called the 'Sarah Marsh,' laden with various packages of merchandise ⟨H⟩, value $10,540.87, enumerated in the shipper's manifest of said Leon Haas, Jr., shall proceed from the port of New York to Matamoras, in Mexico, and shall land the same at the last-mentioned port of Matamoras for consumption, and if the same shall be consumed within the republic of Mexico, and if the said shippers shall, within seven months from the date hereof, produce satisfactory proof to the collector of the port of New York, by consular certificate or otherwise, that the same has been landed and entered for consumption, and actually converted to domestic use, within the republic of Mexico, and the duties thereon paid, and if all laws and departmental regulations shall be strictly obeyed; and if all the conditions of the clearance of said merchandise shall be performed, and specially if said merchandise or any part thereof shall not be transported to any place under insurrectionary control, and if none of said merchandise shall be used in any way, with the consent or knowledge of the shippers or their agents, to give aid or comfort to parties now in rebellion against the United States, then this obligation to be void; otherwise to be and remain in full force and virtue."

The plaintiff having offered in evidence a partial manifest of the cargo of the "Sarah Marsh" relative to the goods represented by the bond,—which manifest showed the portion of the cargo in question to be of the value of $10,540.87, and also proved that she was a general ship, and that other parts of her cargo were owned by others than the principal and sureties on

the bond in question, — offered to prove that the "Sarah Marsh" proceeded out of the port of New York toward Matamoras, which was conceded by the defendant. The plaintiff then offered to prove that that part of her cargo referred to in the bond, and marked ⟨H⟩, value stated at $10,540.87, enumerated in the shipper's manifest of Leon Haas, Jr., was carried in her in March or April, 1863, to the mouth of the Rio Grande; that it was not landed at Matamoras for consumption, nor consumed within the republic of Mexico; that the shippers did not, within seven months from the date of said obligation, produce satisfactory proof to the collector of the port of New York, by consular certificate, or in any manner whatever, that said merchandise had been landed and entered for consumption and actually appropriated to domestic use within said republic, or that the duties thereon had been paid; that the laws and departmental regulations in respect to non-intercourse with portions of the United States in rebellion, and particularly in respect to Texas, were not strictly, or in any manner, obeyed in respect to said goods, and that none of the conditions of the clearance were performed, and especially that said merchandise, and large parts thereof, were transported by the principal in the bond, and by his authorized agents, directly to places under insurrectionary control, and were used with his consent and knowledge, and with the consent and knowledge of his agents, to give aid and comfort to parties then in rebellion against the United States, and specially that part of the cargo represented by the bond was sold to the military authorities of the so-called Confederate States in Brownsville, Texas, some time in the month of April, 1863; but the defendant objected, the objection was sustained, and the plaintiff excepted.

Upon motion of the defendant, the court then directed a verdict for the defendant, to which direction the plaintiff excepted.

Thereupon the jury rendered a verdict for the defendant, and the plaintiff sued out this writ.

The statutes bearing on the question of the collector's authority to require the bond are referred to in the opinion of the court.

*Mr. Assistant-Attorney-General Smith* for the plaintiff in error.

Under the act of May 20, 1862 (12 Stat. 404), the collector of the port of New York had not only authority to require a bond before granting the clearance, but to refuse a clearance altogether. *Bas* v. *Steele,* 3 Wash. 395 ; *Hickey* v. *Huse,* 56 Me. 496 ; *United States* v. *Eliason,* 16 Pet. 291 ; *United States* v. *Freeman,* 3 How. 556.

The bond in suit certainly falls within the " reasonable security " which, by the third section of that act, the Secretary of the Treasury can require, and it is justified by the regulations which that section authorized him to make. When made, those regulations had themselves the force of law. *Gratiot* v. *United States,* 4 How. 80.

The bond is governed by the rules of the common law. *Cox* v. *United States,* 6 Pet. 172. Given by the owner of the goods as his own obligation, and accepted by the collector as such, it was a voluntary undertaking, good and enforceable at law. *United States* v. *Hodson,* 10 Wall. 395 ; *Hamilton* v. *Dillin,* 21 id. 73 ; *United States* v. *Woollen Goods,* 1 Paine, 435, and cases cited.

A bond, although not in exact conformity with the statute, may be good at common law. Any part of it not required by statute may be rejected. *United States* v. *Tingey,* 5 Pet. 115 ; *Kavanagh* v. *Sanders,* 8 Me. 422.

*Mr. F. R. Coudert, contra.*

The bond sued on, being executed in double the amount of the value of the goods, was not authorized by the act of May 20, 1862. Even if the pleadings averred that it was taken under the regulations which the Secretary of the Treasury, by the third section of the act, authorized to make, and those regulations were admissible in evidence, they could not go beyond the provisions of the second section, authorizing the requirement of a bond from the master or owner of the vessel in a penalty equal to the value of the cargo, nor create a liability, nor impose a burden not contemplated by the law itself.

The bond sued on is in no sense a voluntary one. *Dickinson* v. *United States,* 1 Brock. 177 ; *Taber* v. *United States,*

1 Story, 1 ; *United States* v. *Gordon*, 7 Cranch, 287 ; *United States* v. *Morgan*, 3 Wash. 10.

Where a statute prescribes the condition of a bond, its provisions must be strictly complied with, or the bond will be void. *Barnard* v. *Viele*, 21 Wend. (N. Y.) 88. The bond in suit, being highly penal, must be strictly construed.

MR. JUSTICE BRADLEY delivered the opinion of the court.

We think the judgment in this case should be reversed. The objection that the bond does not correspond with the form prescribed by the second section of the act of May 20, 1862 (12 Stat. 404), does not meet the case. It is supported by the third section, if not by the second, in connection with the treasury circular issued under it May 23, 1862.

To understand the force of the objection and the answer to it, it is necessary to look at the general scope of the act.

The first section authorized the Secretary of the Treasury to refuse a clearance to any vessel or other vehicle laden with goods destined for a foreign or domestic port, whenever he should have satisfactory reason to believe that any of the goods, whatever their ostensible destination, were intended for parts or places in the possession or under the control of the insurgents. The second section empowered the collector of customs, in granting a clearance of any vessel for a foreign or domestic port, if he should deem it necessary, under the circumstances of the case, to require a bond from the master or owner of the vessel in a penalty equal to the value of the cargo, that the cargo should be delivered at its destination, and that no part of it should be used to aid any persons in insurrection. This authority given to the collector was independent of any instructions which he might receive from the Secretary, and in no sense conflicted with what the Secretary might do, or require to be done, under the other portions of the act.

The third section gave the Secretary of the Treasury discretionary power to prevent the transportation, in any way, of any goods, whatever their ostensible destination, in all cases where there should be satisfactory reason to believe that they were intended for any place in possession of the insurgents, or

that there was imminent danger of their falling into their possession or control; and also power, in all cases where he should deem it expedient, to require reasonable security that the goods should not be transported to any place under insurrectionary control, and should not in any way be used to give aid or comfort to the insurgents; and he was authorized to establish such general regulations as he should deem necessary and proper to carry into effect the purposes of the act.

The first and second sections related more particularly to clearances of vessels; and the third, to goods to be transported in vessels and other vehicles. The security specified in the second section was required to be given by the master or owner of the vessel, and, as already stated, was to be taken at the discretion of the collector, without further instructions on the subject. The security specified in the third section was not limited to any particular penalty, and it was not stated by whom it should be given. It was to be reasonable security, and would, as a matter of course, have to be furnished by the person who should desire to have the goods transported.

By virtue of the powers conferred by the third section, the Secretary of the Treasury issued instructions to the collector of New York to refuse clearances to all vessels (whatever their ostensible destination) which were believed by him, on satisfactory grounds, to be intended for ports or places in possession or under control of the insurgents; or where there was imminent danger that the goods laden therein should fall into the possession or under the control of the insurgents; and in all cases where, in his judgment, there was ground of apprehension that any goods shipped would be used in any way for the aid of the insurgents, the collector was directed to require substantial security that such goods should not be transported to any place under insurrectionary control, and should not in any way be used to give aid or comfort to the insurgents.

It cannot be pretended that the Secretary of the Treasury exceeded his authority in giving these instructions. They are fully authorized by the third section of the act. We are of opinion that the powers given to the collector by these instructions were sufficient to authorize him to take the bond in

question. It is in double the value of the goods, and is exe-
cuted by the shipper and two sureties. It is not shown that
this was any thing more than "reasonable security." It is con-
ditioned that the vessel in which the goods were laden (which
was bound for Matamoras) should proceed to that place, and
should land the goods there for consumption; that the same
should be consumed in the republic of Mexico; that the ship-
pers should within seven months produce satisfactory proof.
to the collector, by consular certificate or otherwise, that the
same had been landed and entered for consumption, and actu-
ally converted to domestic use, within the republic of Mexico,
and the duties thereon paid; that all laws and departmental
regulations should be strictly obeyed; that all the conditions
of the clearance of said merchandise should be performed;
and, specially, that no part of said merchandise should be
transported to any place under insurrectionary control, and
that none of it should be used in any way, with the consent
or knowledge of the shippers or their agents, to give aid
or comfort to parties then in rebellion against the United
States.

Now, although the condition of the bond is an amplification
of the condition prescribed in the instructions of the Secretary,
yet the amplification is in line with, and intended more effect-
ually to secure the performance of, the condition prescribed.
The instructions authorized the collector to stop the vessel and
the goods from clearing at all, if he believed, on satisfactory
ground, that the latter were intended for places in the posses-
sion of the insurgents, or that there was imminent danger of
their falling into their hands. Now, though he might have
grounds deemed by him satisfactory for believing that the
goods were intended for the use of the insurgents, yet, on
assurances given by the shipper that they were really and
truly intended for consumption in Mexico, he might be willing
to let them go forward, if the shipper would give security that
they should be landed and used in Mexico, and should not,
with his consent or allowance, or that of his agents, be used to
give aid and comfort to the insurgents. This is substantially
what the condition of the bond amounts to. And it cannot be
denied that it is in general conformity with the purpose and

object intended to be secured by the act and the instructions of the Secretary. This purpose and this object were to prevent vessels and goods whose destination was suspicious from getting into the hands of the insurgents. To effect this object, power was given to the Secretary, and by his instructions like power was given to the collector, to refuse a clearance to a vessel or goods absolutely, where there was good ground to believe that they were really destined for the use of the insurgents.

Now, under certain circumstances, specified in the second section of the act, the collector had authority to take a certain bond, without being instructed thereto by the Secretary of the Treasury. By virtue of instructions given by the Secretary under the third section, the collector had authority, and was required, to take a certain other bond; and he was further authorized to refuse a clearance altogether. Under this last power of refusing a clearance, what was there to prevent him, or to make it unlawful for him, to take such a bond as was given in this case, if the owner of the goods chose to enter into it for the purpose of inducing the collector to grant the clearance? It only requires what the law sought to secure. If the shipper chose to give the bond in order to get his goods cleared, it was a voluntary act on his part; and what ground has he or his sureties to complain? The only complaint they could make, if they could make any, was, that the circumstances did not exist which would have justified the collector in refusing a clearance, and that the taking of the bond was, therefore, an act of duress. But this the defendant did not attempt to prove. He put himself at the trial on the sheer ground that the collector had no right to take such a bond at all as the one in question. But the right to take the bond, so far as the shipper and his sureties are concerned, was included in the greater right to refuse the clearance altogether. And the bond itself, duly executed by them, is *prima facie* evidence that it was voluntarily entered into. *United States* v. *Bradley*, 10 Pet. 343.

The government, however, did not rest upon the bond alone, but offered to prove that the goods were not landed at Matamoras, according to their destination; but that, after the

vessel arrived in the mouth of the Rio Grande, they were, with the consent and knowledge of the shipper's agents, actually sold to the military authorities of the Confederate States. This would have been strong presumptive evidence (if any evidence were needed on the subject) that the collector had satisfactory ground of belief that the goods were intended for the use of the insurgents; and that although, as between him and the government, he may have exercised too great indul-. gence to the shipper in taking the bond and letting the goods go forward, yet that the shipper and his sureties had no ground of complaint on that score.

Our opinion is, that, considering the powers which were conferred upon the collector by virtue of the instructions issued by the Secretary of the Treasury under the third section of the act, he had authority to take such a bond as that which is the subject of this suit.

But even if the first condition of the bond, which required the goods to be consumed in the republic of Mexico, were not sustainable, the latter condition, which provided that no part of the goods should be transported to any place under insurrectionary control, and that none of them should be used in any way, with the consent or allowance of the shippers or their agents, to give aid or comfort to parties in rebellion against the United States, is in exact conformity with the instructions, and is severable from the rest. On the authority of *United States* v. *Hodson* (10 Wall. 395), and the cases there relied on, the bond would be good *pro tanto;* and as the evidence offered by the government tended to show a breach of this condition, which is free from objection, it should have been received.

In either aspect of the case, therefore, whether we consider the bond as in general conformity with the object of the act, and voluntarily given by the shipper to obtain a clearance of his goods, or whether we consider it as strictly conformable to the instructions issued under the third section, with only a superadded condition, which may be disregarded, the court below was in error in rejecting the evidence offered by the plaintiff, and directing a verdict for the defendant.

We think the case is covered by the decision in *United*

*States* v. *Hodson*, and other cases of recent consideration which might be referred to.

The judgment of the Circuit Court will be reversed, and the cause remanded for a new trial; and it is

*So ordered.*