### DIAMOND MATCH Co. *v.* UNITED STATES.

*(Circuit Court, D. Connecticut. June 23, 1887.)*

**BOND OF INDEMNITY—EXACTION COLORE OFFICII—COMMISSIONER OF INTERNAL REVENUE.**

A bond of indemnity for the cost of manufacture, in advance of orders, of an estimated three-months supply of private die-stamps, made in accordance with a regulation of the commissioner of internal revenue, and given by the obligor in order to obtain, in the transaction of his business, an accommodation which the commissioner might properly extend, but was not legally required to grant, is not void upon the ground that it was exacted *colore officii*, or for want of consideration.

*Green B. Raum,* for plaintiff.
*Lewis E. Stanton,* U. S. Atty., for the United States.

WALLACE, J. This writ of error is brought to review a judgment of the district court in favor of the United States, and against the plaintiff in error. The action was, by stipulation, tried before a referee. The findings of the referee were confirmed by the district court. The suit was brought upon a bond containing the following conditions:

"The conditions of the foregoing obligation are such that whereas, the said Diamond Match Company is a proprietor of articles subject to stamp duty under Schedule A, and under the provisions of section 3423, Rev. St. U. S., has furnished without expense to the United States its own dies or designs for stamps to be used thereon; and whereas, the said Diamond Match Company is desirous of avoiding the delays in the receipt of such of the aforesaid stamps as it may from time to time order, which would be unavoidable if the same were not printed and prepared for issue prior to the receipt of the order by the commissioner of internal revenue; and whereas, the said the Diamond Match Company has requested, or may hereafter request, the commissioner of internal revenue to prepare and hold, subject to its order, and to keep at all times on hand, an estimated three-months supply of the stamps aforesaid, the estimate of such supply having been made and filed with the said commissioner of internal revenue by the said the Diamond Match Company: Now, therefore, if the said the Diamond Match Company shall, whenever requested so to do by the said commissioner of internal revenue, well and truly pay, or cause to be paid, to the treasurer of the United States, for the use of the United States, all and every such sum or sums of money as the commissioner of internal revenue shall certify to have been paid by the United States for the paper, printing, gumming, and perforating, and preparing for

issue, of the stamps herein referred to, the same having been prepared in accordance with the estimate of the said the Diamond Match Company, which may at any time be found by said commissioner to have been printed for a longer period than three months, (exclusive, however, of such stamps as may have been printed within the three months next preceding the expiration, by repeal or otherwise, of all laws requiring the use thereof,) but not purchased by the said the Diamond Match Company, then this obligation to be void, and of no effect; otherwise to be and remain in full force and virtue."

It appears by the record that, prior to the repeal of the law imposing a tax on matches, the government kept on hand two kinds of internal revenue stamps: *First*, general stamps of a common design, and for sale to and to be used by all parties who might need them; *secondly*, private die-stamps, which were printed from dies engraved for particular parties from special designs, each party providing at its own expense and owning its die and plate, and being alone entitled to receive stamps printed therefrom. ' The present controversy relates to the second kind of stamps named.    Before September 30, 1875, it had been the custom of the government to allow, without any indemnity against loss, the printing of private die-stamps in accordance with the estimates that the die-owners furnished of their anticipated needs.    Shortly before that date it was discovered that large quantities of such stamps were on hand which had been printed in accordance with the estimates therefor, and had never been purchased, and which never would be purchased, because the parties who had given the estimates, and for whom the stamps were printed, had gone out of business.    Thereupon the commissioner of internal revenue established a regulation promulgated in a circular of the date of September 30, 1875, which was as follows:

"It appears that it has heretofore been the practice of this office to print supplies of private-die proprietary stamps, in anticipation of orders therefor from the person, firm, or corporation furnishing the design, and, in the event of the failure or retirement from business, from any cause, of such person, firm, or corporation, the government has been subjected to a loss of the amount expended for paper, and the printing and preparation for issue of the stamps left on hand.    It is believed that this office is not warranted in subjecting the government to losses of this character, and that the printing of private die-stamps before the receipt of orders therefor should be discontinued, or that proper measures should be taken to secure the government against losses arising from such printing.    In future, therefore, such persons, firms, or corporations as order stamps printed from private dies, and desire to avoid the delays consequent upon the printing and preparation of the stamps subsequent to the receipt of an order therefor, will be required to execute and file in this office a bond conditioned for the payment to the treasurer of the United States, for the use of the United States, whenever so required by the commissioner of internal revenue, of such sum or sums as may have been paid by the treasury department for the paper upon which the stamps are printed; together with the printing, perforating, gumming, and preparing for issue of private-die proprietary stamps, not exceeding an estimated three-months supply, as may be prepared under the directions of the commissioner of internal revenue, in accordance with the estimate and request of the person, firm, or corporation ordering the same.    After the approval of the bond, or simultaneously with the filing thereof, an estimate of a three-months average consumption of stamps should be made by the person, firm, or corporation desiring stamps

printed in anticipation of orders, and the same should be accompanied by a request that such number be printed, and kept continuously on hand, awaiting orders therefor."

The bond in suit was executed by the Diamond Match Company at the request of the commissioner of internal revenue, and in pursuance of the regulation set forth, after the company had ineffectually tried to induce the commissioner to recede from his regulation. In April, 1881, the Diamond Match Company became the successor of several match manufacturing companies which had previously existed, was thereafter the owner of 31 dies, was the largest match manufactory in the country, and was continuously needing from 300,000 to 400,000 stamps per month, during the busy season of the year. It was a convenience to the company that the government should have on hand constantly an adequate supply of stamps, printed on its own dies, so that orders could be immediately filled, and it was also of pecuniary benefit not to be compelled to anticipate what quantity would be required in advance, and order the printing in advance, from time to time, and pay for the deliveries of stamps as they might be made under such order. On May 26, 1881, the company gave the commissioner of internal revenue its estimate of a three-months supply of its stamps for use, which was 68,750,000, and requested that that number be kept on hand. Afterwards, on January 27, 1882, the defendant requested that 1,890,000 more stamps should be kept on hand by the commissioner of internal revenue. Thereafter the quantity thus requested, prepared ready for use, was kept in stock by the commissioner. By the act of March 3, 1883, the tax imposed upon matches by section 3419 of the Revised Statutes was repealed, the act to take effect July 1, 1883, and the day after the repeal statute took effect the internal revenue department had on hand 43,133,741 stamps, printed from the private dies of the company, at its request. The expense of manufacturing these stamps had been $4,364.37.

It is now alleged as error that the bond in question was not required or authorized by law, and was exacted by the commissioner of internal revenue *colore officii,* and is therefore void. No other errors are alleged by the plaintiff in error. The real question to be determined is whether there was a valid consideration for the bond. No statute directed the commissioner of the internal revenue to require, or prescribed the giving, of such a bond. But it cannot be maintained that the bond was not given voluntarily, or was exacted *colore officii* by the commissioner, if it was given by the obligor in order to promote its own convenience, and obtain an accommodation in the transaction of its business with the internal revenue department which the government was under no obligation to provide.

As early as in the case of *U. S.* v. *Tingey,* 5 Pet. 115, it was held that a bond not prescribed by law, but voluntarily given to the United States, is a valid obligation; and that the United States have a right to enter into a contract not prohibited by law, and appropriate to the just exercise of their powers, through the instrumentality of the proper de-

partment to which those powers are confided; and that the right to take a bond to secure the government for public moneys intrusted to an agent is an incident to the duties belonging to such a department. The doctrine of that case was reiterated in *U. S.* v. *Bradley*, 10 Pet. 343, and has been followed in *Tyler* v. *Hand*, 7 How. 573; *U. S.* v. *Hodson*, 10 Wall. 395; and *U. S.* v. *Mora*, 97 U. S. 413.

In *Jessup* v. *U. S.*, 106 U. S. 147, 1 Sup. Ct. Rep. 74, the court held that a bond taken by the commissioner of the internal revenue, payable to the United States, conditioned that a manufacturer should pay such sum as he should owe the United States for adhesive stamps, although taken without the authority of a statute, was binding at common law.

It is therefore only necessary to inquire whether the obligor in the present bond executed it in order to obtain a concession which was a matter of favor, and not of right. The system of requiring taxes to be paid by the use of stamps was adopted for the convenience of the government, and not for the accommodation of tax-payers; and undoubtedly contemplated that the department charged with the administration of the internal revenue laws should provide the stamps required by the exigencies of its business, and be at all times prepared to furnish them to those who were entitled to use them. One of its provisions enacted that any proprietor of certain specified articles subject to stamp tax, including matches, should have the privilege of furnishing his own dies or designs for stamps to be used thereon by the commissioner of internal revenue, and directed the commissioner of internal revenue to cause stamps to be made from such dies for the separate use of such proprietor; and, when such stamps were used, dispensed with some of the formalities for cancellation prescribed when ordinary stamps were used. Section 3423, Rev. St. U. S. This was a provision for the accommodation of the manufacturer. He was not required to avail himself of it, but could use ordinary stamps, if he preferred. Neither this section, nor any other provision of the internal revenue law in force when the present bond was executed, required the commissioner of internal revenue to keep on hand, in advance of orders from the manufacturer, such a quantity of stamps printed upon the die of the particular manufacturer as the manufacturer might desire, or any particular quantity. If it should be conceded that it was the duty of the commissioner of internal revenue to keep on hand such a quantity of stamps as a manufacturer of matches might at any time desire to purchase, either for cash or on a credit of 60 days, under section 3425, Rev. St. U. S., it was not his duty, except so far as in his discretion the needs of the department might require it to be done, to keep on hand, in advance of a purchase or order, any specific quantity of stamps made upon the dies of a particular manufacturer. He was under no obligation to print stamps in advance of orders, and run the risk of the loss which might ensue when the stamps were prepared for the use of particular persons who might not need all that were prepared, or might go out of business, or might prefer to purchase or order the ordinary stamps. No duty to the manufacturer required this by implication, because the manufacturer could always procure the ordinary stamps which

it is to be assumed the department would have at all times on hand; or he could, at his option, purchase in advance of his present needs, anticipating the future exigencies of his business, and rely upon obtaining a repayment of the amount paid for those not used, under the provisions of section 3426, Rev. St. U. S.

In this view the regulation of the commissioner of internal revenue, under which this bond was given, was a just and wise one. It was calculated to indemnify the government against the risk of loss which those who desired to avail themselves of exceptional facilities in their business with the department could not expect the government to assume. The bond was given to obtain an accommodation which the commissioner of internal revenue might properly extend, but which he was not required by law to give.

The judgment of the district court is affirmed.