# THE UNITED STATES *v.* PUMPHREY.

BONDS EXECUTED TO UNITED STATES; TRIBAL INDIANS.

A bond voluntarily executed to the United States conditioned upon the faithful performance of a contract with a number of tribal Indians, whereby the Indians were temporarily employed by the obligors, who contracted among other things to pay them monthly salaries, to provide them with proper food and raiment, and to return them to the Government agency within a specified time without expense to the United States, is a valid and binding obligation, although not authorized by statute; and for breaches of its conditions the United States can recover not only for the expense the Government may have incurred in returning the Indians to the agency, but for the amount due the Indians for nonperformance of the contract, as the seal of the instrument imports a consideration, and an action thereon could not be maintained at law except in the name of the obligees.

No. 684.   Submitted April 8, 1897.   Decided April 28, 1897.

HEARING on an appeal by the United States from a judgment sustaining a demurrer to a declaration in an action upon a bond.  *Reversed.*

The COURT in its opinion stated the case as follows:

The United States have appealed from a judgment of the Supreme Court of the District of Columbia rendered against them in an action upon a bond.   The declaration, to which a demurrer was sustained, sets out the following facts, substantially:

1. Defendant, James W. Pumphrey, together with William L. Taylor and Augustus Davis, Jr., on August 21, 1894, signed, sealed and delivered the bond, wherein they acknowledged themselves to be indebted to the plaintiffs in the sum of $5,000.

2. The condition of the bond was the faithful performance of certain contracts made by said William L. Taylor, with

the consent and express approval of the Commissioner of Indian Affairs, with certain Indians, male and female, named in the bond as follows: Eagle Voice, Black Hawk, At the Straight, Running Bear, Blue Bird, Cyrus Stone, Holy Bird, Case Knife, Clement Whirlwind Soldier, Duck, Mrs. Black Hawk (Red Woman), Columbia Crazy Cat, Jumper, Emma Blue Bird, and Arrow Side.

3. These Indians belonged to the Rosebud Agency, South Dakota, and were engaged to accompany said Taylor and form a part of a "Wild West Show" which he proposed to exhibit throughout the country.

4. The contracts are set out in the declaration, and appear to have been formally executed by the parties respectively and approved by the Indian agent.

5. In consideration of the services of the said Indians, said Taylor agreed to pay them a monthly salary from the date of departure from the agency until return thereto; the payment for the last month to be paid after the return of the Indians to the agency, and in the presence of the Indian agent. He further agreed to provide them with proper food and raiment, and to discharge all traveling and needful incidental expenses during the said time; to protect them from immoral influences and surroundings; to provide all medical attendance and medicine; to do all things requisite and proper for their health, comfort and welfare, and to return them to the agency within the time specified by the Department of the Interior without charge or cost to them or to the United States.

6. The said contracts and bond having been approved by the Commissioner, the said Indians departed from the agency August 21, 1894, and remained away, in the performance of their obligations, until April, 1895.

7. The said Taylor did not perform his contract as stipulated. He failed and refused to pay the salaries contracted for and to discharge their traveling and needful incidental expenses, and to furnish them proper raiment.

He further failed to provide them with the necessary means to return to their said agency, and the United States were compelled to return them and to pay all the cost of their transportation from Louisville, Kentucky, to said agency.

8. The sums due the said Indians for wages and damages amount to $2,800, and the amount expended for them by the United States as aforesaid was $434; and of these recovery is prayed.

*Mr. Henry E. Davis*, U. S. Attorney for the District of Columbia, for the United States:

1. The United States have an interest in the subject matter. Section 463, Revised Statutes, provides that: "The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations." See *The Cherokee Nation* v. *Georgia*, 5 Pet. 17; *United States* v. *Kagama*, 118 U. S. 383; *Choctaw Nation* v. *United States*, 119 U. S. 1.

2. The United States are competent to contract in the premises. *United States* v. *Tingey*, 5 Pet. 127. That a bond made payable to the United States, even if taken without authority of a statute, is binding at common law, see *Tyler* v. *Hand*, 7 Howard, 573; *Jessup* v. *United States*, 106 U. S. 147; *United States* v. *Bradley*, 10 Pet. 343; *United States* v. *Hodson*, 10 Wallace, 395. The bond was voluntarily entered into, and is itself *prima facie* evidence of that fact. *United States* v. *Mora*, 97 U. S. 413.

*Mr. J. J. Johnson* and *Mr. D. W. Baker* for the appellees:

1. A bond made to the United States for a matter in which the United States has no interest is void. *United States* v. *Draper*, 19 D. C. 85. There is no doubt that it is incumbent upon the party suing on the bond to show that

he has an interest in it before he can recover in a regular trial prosecuted to verdict. *Ing* v. *State*, 8 Md. 295. Again it has been held that no officer of the Government of the United States has any authority to take a bond not authorized by law, and that in no case can the bond be treated as a mere voluntary bond. *Jackson* v. *Simonton*, 4 Cr. C. C. 255.

2. The bond sued on in this case can not be treated as a voluntary bond on the part of the defendants, as the declaration fails to show damage on the part of the United States. *Com.* v. *Bassford*, 1 E. D. Smith, 233; *Breen* v. *Kelly*, 47 N. W. Rep. 1067.

If the fact that the execution of the bond was voluntary, would make it valid, there might be an estoppel. But there could be none as to the capacity of the United States to take the bond, as that is matter of law, and none of the authorities hold that the United States have authority to take a common law bond other than for the faithful performance of the duties of their officers and servants. Story on Constitution, Vol. 2, p. 1330, and cases cited; *United States* v. *Draper*, 19 D. C. 85.

No action can be brought on a bond of indemnity, unless the plaintiff has been damnified, and this must be shown in the declaration. *Coe* v. *Rankin*, 5 McLean, 354. The damage must have been suffered or paid by compulsion, by some proceedings *in invitum* against the party indemnified. *Crippin* v. *Thompson*, 6 Barb. 532.

3. The contracts set out in the declaration were not validly executed under Section 2103, R. S., and are therefore null and void and no action lies on the bond to recover money due on them. The sureties have a right to take advantage of the nullity of said contracts, and are not liable on the bond sued upon. *State* v. *Pollard*, 7 So. Rep. 765.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The bond that is the subject of the controversy was not required or expressly authorized to be taken by any

statute of the United States, and its validity must therefore depend upon some other support. At the same time, it can not be said to have been extorted in violation of law or as a condition to permission to exercise a plain legal right under existing laws. Therefore, it cannot be declared void on that ground; for it must now be regarded as settled beyond all question that the binding force of an obligation voluntarily executed to the United States, does not necessarily depend upon the existence of previous statutory authority therefor. They may, as a body politic, within the sphere of the constitutional powers conferred upon them and through the instrumentality of the proper department to which these powers are confided, enter into contracts not prohibited by law, when appropriate to the just exercise of those powers. *United States* v. *Tingey*, 5 Pet. 115, 127; *United States* v. *Bradley*, 10 Pet. 343, 350; *United States* v. *Linn*, 15 Pet. 290; *Tyler* v. *Hand*, 7 How. 573; *United States* v. *Hodson*, 10 Wall. 395, 406; *United States* v. *Mora*, 97 U. S. 413, 421; *Jessup* v. *United States*, 106 U. S. 147, 151; *Howgate* v. *United States*, 3 App. D. C. 277, 295.

The beneficiaries of the bond, in so far as the special contracts are concerned, were not citizens of the United States or of a State, but members of a tribe of Sioux Indians living upon a reservation that had been assigned by Act of Congress (25 Stat. 888), for their occupation and use under the general supervision and control of the Government. It is, therefore, claimed on behalf of the United States that the bond was voluntarily given by the makers and received by the proper officers of the Government, in the course of this general power of supervision and control, both for the indemnification of the Government and for the security of the Indians, with whom it had permitted the contracts to be made; and is, in consequence, a valid common law obligation and enforceable as such. Under the allegations of the declaration, admitted by the demurrer, the bond was voluntarily given by the makers in furtherance of their own in-

terests. The executed bond itself is a *prima facie* evidence that it was voluntarily entered into. *United States* v. *Mora,* 97 U. S. 413, 421. It was not within the prohibition of any statute or contrary to public policy, and appears to have been accepted for the commendable purpose of securing wages for these untutored people and their payment when earned. It may be conceded, however, that if the United States had no special power of supervision and control over the privileges and interests of these Indians, as such, the bond would be invalid; for the United States cannot assume guardianship of an individual and make contracts concerning his private affairs that they may enforce, or that he, even, might enforce for his own benefit, as can be done, in some instances, by a third person, in the case of a contract made between others for his express benefit, or to which he may, in some proper manner, be privy. It follows, then, that the right of the United States to recover, by virtue of this bond, either to the extent of their own damage incurred in the return of the Indians to their reservation, or for the benefit of the Indians themselves, to the extent of the special damages sustained by them through the breach of their contracts as named in the bond, must depend upon the nature of the relations of said Indians to the Government, its powers of control over, and its duties and obligations to them.

2. Beginning early in the history of the Republic, it was the custom to make solemn treaties with the Indian tribes until the practice was declared at an end by act of Congress, March 3, 1871 (R. S., Sec. 2079.) But notwithstanding such a treaty had been made with the Cherokee tribe or nation, as it was called, that nation was declared not to be entitled to bring a suit against a State of the Union in the Supreme Court of the United States, as a foreign State within the provision of Section 2 of Article 3 of the Constitution. *Cherokee Nation* v. *Georgia,* 5 Pet. 1. In that case, Chief Justice Marshall said: " They may more correctly perhaps be

11 Ct. App.—5.

denominated domestic dependent nations.   They occupy a
territory to which we assert a title independent of their will,
which must take effect in point of possession when their
right of possession ceases.   Meanwhile they are in a state of
pupilage.   Their relation to the United States resembles
that of a ward to his guardian.   They look to the Govern-
ment for protection; rely upon its kindness and its power;
appeal to it for relief to their wants; and address the Presi-
dent as their great father."   Id. p. 17.

In the *United States* v. *Forty-three Gallons of Whiskey*, 93
U. S. 188, 194, it was also said: "The only efficient way of
dealing with the Indian tribes was to place them under the
protection of the General Government.   Their peculiar
habits and character required this; and the history of the
country shows the necessity of keeping them separate, sub-
ordinate and dependent."   Again, it was said in *United
States* v. *Kagama*, 118 U. S. 375, 383: "These Indian tribes
*are* the wards of the nation.   They are communities *depend-
ent* on the United States.   Dependent largely for their daily
food.   Dependent for their political rights.   They owe no
allegiance to the States and receive from them no protection.
Because of the local ill feeling, the people of the States
where they are found are often their deadliest enemies.
From their very weakness and helplessness, so largely due
to the course of dealing of the Federal Government with
them, and the treaties in which it has been promised, there
arises the duty of protection and with it the power.   This
has always been recognized by the Executive and by Con-
gress, and by this court, whenever the question has arisen."
See also *Cherokee Nation* v. *Kansas R. Co.*, 135 U. S. 641,
655.

This guardianship extends to the individual members of
the tribe as long as they are to be regarded as such, and the
continuation of the recognition of tribal existence is a mat-
ter for the determination of the political department, in
which it will be respected and followed by the courts.   *United*

*States* v. *Holliday,* 3 Wall. 407, 419. In that case it was held that a citizen could be punished under the provisions of an act of Congress forbidding the sale of liquor to "any Indian under the charge of an Indian agent or superintendent," although the sale had been made to an Indian in the State of Michigan, who occupied and owned land, and who had, under the authority of the law of that State, voted in county and town elections; it being made to appear that he was still connected with his tribe, and continued to receive his annuity under the treaty therewith.

3. The foregoing view of the relations of the Indians with the United States has been acted upon by the political department of the Government for many years without change, except to make those relations closer and more binding. A Commissioner of Indian Affairs has been provided, who has the general management of all affairs and relations with the Indians. The limited nationality of the tribes is no longer recognized save in respect of former treaties. No more treaties are permitted to be made, and since March 3, 1871, they have been subjected to the disposition of Congress. R. S., Sec. 2079. Tribes and remnants of tribes have been assigned to reservations of public lands where they are subjected to the control of resident superintendents and agents appointed by the President. Severe penalties are provided for persons occupying or grazing their lands. Persons found within those reservations contrary to law may be forcibly removed by the agents, and all persons whose presence may, in the judgment of the agents, be detrimental to peace and good order are subject to summary expulsion. Their surplus live stock may be sold for their benefit by the agents. Id., Sec. 2127. Trading with them must be under license with bond to secure lawful conduct, and the privilege is subject to arbitrary revocation. The President has the power at any time to prohibit the introduction of any particular article into the country of a tribe, and, as we have seen in some of the cases above cited, severe penalties have

been provided against the introduction of intoxicating liquors into the Indian country, and their sale to any Indian connected with a tribe or reservation. They are expected to remain upon their reservations, subject to the supervision of the agents, and these are prohibited by express enactment from giving permission, in writing or otherwise, to an Indian to enter at least one State of the Union, upon any pretext whatever. 21 Stat. 132. They receive frequent distributions of money, food and supplies. Large sums are annually appropriated by Congress for their use and benefit in these and other respects. Schools are provided for the education of their children, and opportunities for religious instruction are afforded. Instructors are provided to train them in husbandry and in some of the mechanical arts. When prepared for and desiring to adopt the habits of civilized life, provision is made for the allotment of lands in severalty; and in all cases of allotment, the title is to be retained by the United States in trust for the period of twenty-five years, and the agents of the Government are required to protect each person in his possession. At the end of the twenty-five years the absolute title becomes vested in the occupant.

When an Indian shall have availed himself of the foregoing privilege, he is declared entitled to all the immunities and privileges of citizens of the United States, as well as to the equal protection of the laws. 24 Stat. 388.

4. Without undertaking to mention all the particular subjects of legislation concerning the Indians, or to enumerate all the decisions of the courts in which their relations to the United States have been discussed and determined, we think that enough has been recited to show that they are, in a general sense, "wards of the nation," and entitled to the care and protection of the Government, collectively and individually, until such time as they may become absorbed in the population and citizenship of the several

States, and cease to be recognized and treated by Congress as remaining separate and apart, under their old tribal or community associations, as Indians only. Occupying this relation, the Indians, for whose protection, in part, this bond was delivered and received, were permitted and encouraged to leave the reservation temporarily, in the performance of their contracts. The payments promised them were not made, and they were left penniless and helpless in a distant State. The Government owed them the duty to return them to their reservation, and in its performance expended money that had been appropriated for disbursement for the benefit of the Indians, under the direction of the Department of the Interior. One of the conditions of the bond was made in order to indemnify the Government against this contingent liability. The United States could have refused permission to the Indians to accompany Taylor. Having given it, they incurred obligation for the cost of their return in case Taylor should fail to perform his contracts. Taylor gave the bond in order to obtain this permission, as well as to secure the payments promised to the Indians. Having done so, why should not his sureties be compelled to answer for the breach? *United States* v. *Mora,* 97 U. S. 413, 421. In that case, in order to procure the clearance of a vessel from the port of New York to the Mexican port of Matamoras (A. D. 1863), the owner was compelled to give a bond to the United States in double the value of the cargo, conditioned that the vessel should proceed to the port of destination, land its cargo for consumption in Mexico, and specially, that the same should not be transported to any place "under insurrectionary control," and so forth. Suit was brought upon the bond for breach of the aforesaid conditions. The bond was not required by the statute. The collector was authorized to take certain other bonds, and also to refuse clearance altogether. Instead of refusing the clearance, he granted the same in consideration of the execution of the bond. It was held that the United States could recover of

the surety thereon. In delivering the opinion of the court, Mr. Justice Bradley said:

"Now, under certain circumstances, specified in the second section of the act, the collector had authority to take a certain bond, without being instructed thereto by the Secretary of the Treasury. By virtue of instructions given by the Secretary, under the third section, the collector had authority, and was required to take a certain other bond, and he was further authorized to refuse a clearance altogether. Under this last power of refusing a clearance, what was there to prevent him, or to make it unlawful for him, to take such a bond as was given in this case, if the owner of the goods chose to enter into it for the purpose of inducing the collector to grant the clearance? It only requires what the law sought to secure. If the shipper chose to give the bond in order to get his goods cleared, it was a voluntary act on his part; and what ground has he or his sureties to complain? The only complaint they could make, if they could make any, was, that the circumstances did not exist which would have justified the collector in refusing a clearance, and that the taking of the bond was therefore an act of duress. But this the defendant did not attempt to prove. He put himself at the trial on the sheer ground that the collector had no right to take such a bond at all as the one in question. But the right to take the bond, so far as the shipper and his sureties are concerned, was included in the greater right to refuse the clearance altogether."

It is to be observed, also, that the bond in the foregoing case was strictly penal, the Government sustaining no pecuniary loss or damage that could be estimated; but in the case at bar the bond is one of indemnity against such actual loss, and the damage is limited and ascertainable with certainty.

We think, then, that to the extent of the money actually expended by the United States for the return of the Indians, they are entitled to recover in this action. Even if the re-

maining conditions of the bond should be held unwarranted by law or illegal, they would not prevent recovery for the breach of this one, as they are separable therefrom. *United States* v. *Hodson,* 10 Wall. 395, 408; *United States* v. *Mora,* 97 U. S. 413, 422.

5. Coming now to the particular consideration of the conditions of the bond looking to the performance of Taylor's contracts with the Indians separately, we think it equally clear that they cannot be declared invalid upon the ground that there was no express authority of law therefor. In view of the dependent relations of the Indians as hereinbefore stated, we think the bond comes within the rule enounced in *Tyler* v. *Hand,* 7 How. 573, 583.

In that case, it appears that Martin Van Buren, as President of the United States, had sold to the defendants certain sections of public land that had been set apart in a treaty made in 1830 with the Choctaw Indians for the benefit of the orphan children of that tribe. The sales were made upon credit and bonds for the purchase money were made payable to Martin Van Buren, President of the United States, and his successors, for the use of the orphan children provided for in the treaty. Suit was brought upon the bonds by a succeeding President, John Tyler, for the use, and so forth, as aforesaid, without designating the particular beneficiaries by name. A demurrer was sustained to the declaration, the grounds of which, among others, were, that plaintiff showed no title to the bonds, nor such an interest in the suit as authorized him to maintain it; and that they were without consideration or the authority of law. This judgment was reversed, and the cause remanded, with direction to overrule the demurrer and enter judgment for the plaintiff for the amount of principal and interest due on the bonds. Discussing the bonds, the court said: "They are valid instruments though voluntarily given and not prescribed by law. *United States* v. *Tingey,* 5 Pet. 115. It is not the case of a bond given contrary to law, or in violation of law, but

that of bonds given voluntarily for a consideration expressed in them, to a public officer, but not happening to be prescribed by law."

In order to maintain the action it is not essential that the United States should have a beneficial interest in the performance of these conditions. The seal of the instrument imports a consideration, and action thereon cannot be maintained at law except in the name of the obligees. *Anderson* v. *Longdon*, 1 Wheat. 85; *Hoxie* v. *Weston*, 19 Me. 322, 329; *Baker* v. *Haley*, 5 Greenleaf, 240; *Sanders* v. *Tilley*, 12 Pick. 554; *Northampton* v. *Elwell*, 4 Gray, 81; *Tyler* v. *Hand*, 7 How. 583.

The judgment that may be rendered herein will effectually bar any other action that might be brought upon the bond in any right or interest whatsoever. The trust on behalf of the Indians is apparent on the face of the bond, and it is not perceived how the defendant is concerned in the final adjustment of the equities of the subject matter between the United States and the several Indian beneficiaries.

For the reasons given, the judgment will be reversed, with costs to the appellants, and the cause remanded for further proceedings not inconsistent with this opinion. It is so ordered. *Reversed and remanded.*