# CHEROKEE NATION *v.* SOUTHERN KANSAS RAILWAY COMPANY

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 664.   Argued March 12, 1890. — Decided May 19, 1890.

The act of Congress of July 4, 1884, 23 Stat. 73, c. 179, granting a right of way through the Indian Territory to the Southern Kansas Railway Company, for a railroad, telegraph and telephone line, is a valid exercise of the power of Congress to regulate commerce among the several States and with the Indian tribes.

The Cherokee Nation filed in the court below a bill of complaint, seeking a decree enjoining the Southern Kansas Railway Company from entering upon the lands of that nation for the purpose of constructing its proposed railway, and, if that relief could not be granted, then that its bill might be treated as an original complaint and petition in appeal as provided in § 3, c. 179, act of July 4, 1884, 23 Stat. 73 : *Held*,

(1) That these two causes of action, one of an equitable and the other of a legal nature, could not be joined in the same suit;

(2) That the court below erred in not treating the complaint as a petition of appeal which entitled the petitioners to have a trial *de novo* of the question of damages for the lands and rights proposed to be taken.

The Cherokee Nation is not sovereign in the sense that the United States or a State is sovereign, but is now, as heretofore, a dependent political community, subject to the paramount authority of the United States.

The United States may exercise the right of eminent domain in respect to lands in the Territories, as in any of the States, for purposes necessary to the execution of the powers belonging to the General Government, such an exercise being essential to their independent existence and perpetuity.

All lands held by private persons within the limits of the United States are held subject to the authority of the General Government to take them for such objects as are germane to the execution of the powers granted to it, provided only that they are not taken without just compensation being made to the owner.

In the execution of the power to regulate commerce Congress may employ, as instrumentalities, corporations created by it or by the States.

A railroad is a public highway, established primarily for the convenience of the people, and to subserve public ends, and is subject to governmental control and regulation; and for these reasons the corporation owning

it may, under legislative sanction, take private property for a right of way, upon making just compensation to the owner.

The act granting a right of way to the Southern Kansas Railway Company through the Indian Territory authorized the company to enter upon the lands taken for right of way after it should have paid into court double the amount of the award of the referees appointed by the President: *Held*, that this was a sufficient provision to secure just compensation; that the Constitution does not require that compensation shall be made in advance of the appropriation of lands for a right of way; that it is sufficient if adequate provision be made to secure just compensation; that the title does not pass from the owner till such compensation is actually received; and that if the railway company fails to pay the amount ascertained it will thereafter be a trespasser, although before the termination of the proceedings instituted to fix the compensation, it may have rightfully entered upon the lands for the purpose of constructing its road.

IN EQUITY. The case is stated in the opinion.

*Mr. J. E. McDonald* and *Mr. John C. Fay* (with whom was *Mr. R. J. Bright* on the brief) for appellant.

*Mr. George R. Peck* and *Mr. A. B. Browne* (with whom was *Mr. A. T. Britton* on the brief) for appellee.

MR. JUSTICE HARLAN delivered the opinion of the court.

This is an appeal from a decree of the District Court of the United States for the Western District of Arkansas. The litigation between the parties arises out of an act of Congress, approved July 4, 1884, entitled "An act to grant the right of way through the Indian Territory to the Southern Kansas Railway Company, and for other purposes." 23 Stat. 73. By the first section of that act the above company was authorized to locate, construct, operate and maintain a railway, telegraph and telephone line, through the Indian Territory, beginning at a point on the northern line of the Territory, where an extension of the Southern Kansas Railway from Winfield in a southerly direction would strike that line, running thence south in the direction of Dennison, Texas, on the most practicable route, to a point at or near where the Washita River empties into the Red River, with a branch constructed

from a point at or near where the main line crosses the northern line of the Territory, westwardly along or near that line to a point at or near where Medicine Lodge Creek crosses the northern line of the Territory, and from that point in a southwesterly direction, crossing Beaver Creek at or near Camp Supply, and reaching the west line of the Indian Territory at or near where Wolf Creek crosses the same, with the right to construct, use and maintain such tracks, turnouts and sidings as the company might deem it to their interest to construct along and upon the right of way and depot ground by that act granted. The second section grants to the company a right of way of a prescribed width through the Territory for its main line and branch road, stations and telegraph and telephone lines, subject to the condition that no part of the lands granted shall be used otherwise than for the company's railroad, telegraph and telephone lines, and that if any portion ceases to be so used, it shall revert to the nation or tribe of Indians from which it was taken.

The third section, upon which some of the principal questions in the case depend, is in these words :

" SEC. 3. That before said railway shall be constructed through any lands held by individual occupants, according to the laws, customs and usages of any of the Indian nations or tribes through which it may be constructed, full compensation shall be made to such occupants for all property to be taken or damage done by reason of the construction of such railway. In case of failure to make amicable settlement with any occupant, such compensation shall be determined by the appraisement of three disinterested referees, to be appointed by the President, who, before entering upon the duties of their appointment, shall take and subscribe, before competent authority, an oath that they will faithfully and impartially discharge the duties of their appointment, which oath, duly certified, shall be returned with their award. In case the referees cannot agree, then any two of them are authorized to make the award. Either party being dissatisfied with the finding of the referees shall have the right, within ninety days after the making of the award and notice of the same, to appeal by

original petition to the courts, where the case shall be tried *de novo.* When proceedings have been commenced in court, the railway company shall pay double the amount of the award into court to abide the judgment thereof, and then have the right to enter upon the property sought to be condemned, and proceed with the construction of the railroad. Each of said referees shall receive for their services the sum of four dollars per day for each day they are engaged in the trial of any case submitted to them under this act, with mileage at five cents per mile. Witnesses shall receive the usual fees allowed by the courts of said nations, costs, including compensation of the referees, shall be made a part of the award, and be paid by such railroad company."

The 5th, 6th and 8th sections are as follows :

"Sec. 5. That said railway company shall pay to the Secretary of the Interior, for the benefit of the particular nations or tribes through whose lands said main line and branch may be located, the sum of fifty dollars, in addition to compensation provided for in this act for property taken and damages done by the construction of the railway for each mile of railway that it may construct in said Territory, said payments to be made in instalments of five hundred dollars as each ten miles of road is graded. Said company shall also pay, so long as said Territory is owned and occupied by the Indians, to the Secretary of the Interior the sum of fifteen dollars per annum for each mile of railway it shall construct in the said Territory. The money paid to the Secretary of the Interior under the provisions of this act shall be apportioned by him, in accordance with the laws and treaties now in force among the different nations and tribes, according to the number of miles of railway that may be constructed by said railway company through their lands : *Provided,* That Congress shall have the right, so long as said lands are occupied and possessed by said nations and tribes, to impose such additional taxes upon said railroad as it may deem just and proper for their benefit : *Provided further,* That if the general counsel [council] of either of the nations or tribes through whose lands said railway may be located shall within four months

after the filing of maps of definite location as set forth in section six of this act, dissent from the allowances provided for in this section, and shall certify the same to the Secretary of the Interior, then all compensation to be paid to such dissenting nation or tribe under the provisions of this act shall be determined as provided in section three for the determination of the compensation to be paid to the individual occupant of lands with the right of appeal to the courts upon the same terms, conditions and requirements as therein provided : *Provided further,* That the amount awarded or adjudged to be paid by said railway company for said dissenting nation or tribe shall be in lieu of the compensation that said nation or tribe would be entitled to receive under the provisions of this section. Nothing in this act shall be construed to prohibit Congress from imposing taxes upon said railway, nor any Territory or State hereafter formed through which said railway shall have been established from exercising the like power as to such part of said railway as may lie within its limits. Said railway company shall have the right to survey and locate its railway immediately after the passage of this act.

"Sec. 6. That said company shall cause maps showing the route of its located lines through said Territory to be filed in the office of the Secretary of the Interior, and also to be filed in the office of the principal chief of each of the nations or tribes through whose lands said railway may be located ; and after the filing of said maps no claim for a subsequent settlement and improvement upon the right of way shown by said maps shall be valid as against said company : *Provided,* That when a map showing any portion of said railway company's located line is filed as herein provided for, said company shall commence grading said located line within six months thereafter, or such location shall be void, and said location shall be approved by the Secretary of the Interior in sections of twenty-five miles before construction of any such section shall be begun."

"Sec. 8. That the United States Circuit and District Courts for the Northern District of Texas, the Western District of

Arkansas; and the District of Kansas, and such other courts as may be authorized by Congress, shall have, without reference to the amount in controversy, concurrent jurisdiction over all controversies arising between said Southern Kansas Railway Company and the nations and tribes through whose territory said railway shall be constructed. Said courts shall have like jurisdiction, without reference to the amount in controversy, over all controversies arising between the inhabitants of said nations or tribes and said railway company; and the civil juris-diction of said courts is hereby extended within the limits of said Indian Territory without distinction as to citizenship of the parties, so far as may be necessary to carry out the provis-ions of this act."

The Cherokee Nation having dissented from the allowance provided for in the fifth section of the above act, commis-sioners were appointed by the President, as provided in the third section. They met at Topeka, Kansas, on the 26th of August, 1886, and, having duly qualified according to law, proceeded to the Indian Territory in the discharge of their duties. Their report to the President, made September 25, 1886, states that they inspected the located line of road as it trav-ersed the territory of the Cherokee Nation, with its branch, and that upon an actual view of the lands proposed to be taken and appropriated for right of way, station grounds, etc., under the act of Congress, they found that said Nation was entitled to receive as adequate compensation for such lands and for damages done by the construction of the railway, for thirty-five and one-half miles of the main line, the sum of $93 for each mile, aggregating for the whole distance $3301.50. They also found and awarded as adequate compensation and dam-ages in respect to the lands to be taken and appropriated for the branch line, one hundred and twelve and $\frac{54}{100}$ miles in length, the sum of $36 for each mile, aggregating for the whole distance the sum of $4051.44. The commissioners or-dered that the railway company, within ten days after receiv-ing notice from the Secretary of the Interior that their report was filed, should deposit with that officer the total amount of the awards made by them, for such disposition under the law

and the order of the Secretary as might be just and proper. This report having been filed in the office of the Secretary of the Interior, its contents were made known by that officer to the principal chief of the Cherokee Nation in a communication dated October 29, 1886.

The Cherokee Nation, by the act of its National Council, approved December 17, 1886, concurred in by its House, December 16, 1886, dissented from and rejected as unjust, inequitable and without authority of law, the award made by the commissioners.

The third, fourth, fifth and eighth sections of that act are as follows :

" Sec. 3. That the Cherokee Nation does not concede to the United States the rightful power, through its constituted authorities, to authorize any private individual or corporation to enter upon, appropriate and use any lands belonging to said Nation without first obtaining the consent of the constituted authorities of said Nation, and hereby protests against the action of said Southern Kansas Railway Company in entering upon and appropriating the lands of the Cherokee Nation as an arbitrary and unjust violation of the guaranteed rights of said Nation.

" Sec. 4. That the principal chief be, and he is hereby, authorized and empowered to proceed in pursuance of the provisions of the third and the eighth sections of said act of Congress, and bring suit in the Circuit Court of the United States in and for the Western District of Arkansas against said Southern Kansas Railway Company, the object of said suit being to vindicate the absolute title of the Cherokee Nation to all lands within her borders, and to obtain redress from said company for such damages, as may have been sustained by said Nation by means of the location and construction of said railroad : *Provided*, That nothing herein shall be construed as an acknowledgment by the Cherokee Nation of the right of the United States to appropriate the lands of the Cherokee Nation for the benefit of private corporations without its consent.

" Sec. 5. That the principal chief be, and he is hereby, further authorized and empowered to employ suitable counsel for the

bringing and management of said suit on the part of the
Cherokee Nation."

"Sec. 8. That the principal chief be, and he is hereby,
authorized and required to certify the provisions of this act to
the Secretary of the Interior in pursuance of the provisions of
the fifth section of act of Congress."

Subsequently, the Cherokee Nation, by its attorneys, sent
a communication to the President of the United States, in
which that Nation, with its principal chief — reserving to that
Nation all rights and claims in and to the common property
thereof as absolute owner of the same, and expressly denying
the right and authority of the United States to grant to
persons or corporations any easement, right of way, or prop-
erty right whatever in, to and upon their common property,
as specially set forth in their protest of December 12, 1884 —
appealed to the Circuit Court of the United States of the West-
ern District of Arkansas from the award and judgment of
the referees, and prayed that a transcript of all the proceed-
ings relating to the award, together with their appeal, be cer-
tified to that court.

In consequence of this communication and appeal, the Sec-
retary of the Interior, January 22, 1887, transmitted to that
court all of said proceedings on file in his department, as far
as they related to the Cherokee lands, proposed to be taken
by the railroad company.

The bill in the present case was filed in that court on the
26th day of January, 1887.

It alleges that the Cherokee Nation is a sovereign State,
recognized as such by the various treaties made between it and
the United States, beginning with that of Hopewell, Novem-
ber 22, 1785, and ending with that of Washington, July 10,
1866 ; and is entitled to exercise, and is exercising the powers,
jurisdiction and functions of a sovereign State within the
territory ceded to it and defined under the treaty of Fort
Gibson, February 14, 1833.

It also alleges that by virtue of its inherent sovereignty, as
recognized by those treaties, the right of eminent domain,
with other rights of sovereignty in its country, remains exclu-

sively vested in it; that in addition to the cessions of territory by the above treaties, for which it gave a full and valuable consideration, the United States, by letters patent, conveyed said territory to it in fee simple; that all of such territory remains under the jurisdiction and sovereignty of the plaintiff, except certain tracts lying west of the 96th degree of west longitude and north of the 37th degree of north latitude, which have been conveyed back to the United States by the Cherokee Nation under the terms of the treaty of 1866; that the Southern Kansas Railway Company, without right and without consent or license from the plaintiff, entered its domain and territory and commenced the construction over it of a railway; that in the construction of such railway that company had commenced cutting down the natural surface of the land, building embankments thereon, and appropriating the stone, earth and lumber found on the line of the proposed road; had graded about ten miles of its road, and threatened and intended to carry on the same damage and destruction of the plaintiff's property throughout the whole of the proposed line of road, destroying the property and depriving the plaintiff, by reason of the construction of such road, of a large revenue arising from the rental of its property for grazing purposes under existing leases of the lands proposed to be occupied by the railway company, and causing thereby irreparable loss and damage to the plaintiff. Referring to the act of Congress, the plaintiff avers that no jurisdiction or authority remained in the United States to grant any right of way through its territory, and that the right of eminent domain over that territory remained, under the above treaties and patents, in the plaintiff. The bill then sets forth the facts already stated in relation to the proceedings taken by the commissioners appointed under the act of Congress, and proceeds:

"That, even though the said referees had been authorized to make the award referred to, the sum by them awarded is entirely insufficient and inadequate compensation for the said right of way; that the same is reasonably worth the sum of $500 per mile, and your complainant, protesting against the

said award and insisting that the United States have no power to grant a right of way through the territory of your complainant without its consent, and protesting and insisting that the said referees had no lawful authority to make an award for the lands so intended to be taken from your complainant or its domain, and that even on payment of the compensation so awarded the said corporation could acquire no right to build its road through the territory of your complainant without its consent, still insists that the compensation so proposed to be awarded and paid is inadequate, insufficient for the land proposed to be taken, and prays that this complaint may be taken and treated as an original complaint and petition in appeal from the action of the said referees, as provided by section 3 of the act of July 4, 1884, aforesaid.

"Your complainant avers that, by reason of the premises aforesaid, the referees aforesaid had no authority to condemn any of the land or territory of your complainant or to make any award therefor, and that no right accrued to the said Southern Kansas Railway Company to enter upon or build said proposed railway through the territory of your complainant."

The prayer of the bill is that the said awards be vacated and set aside; that the defendant be restrained and perpetually enjoined from locating or attempting to locate, construct, equip, operate, use, or maintain a railway, telegraph or telephone line through the land, domain or territory of the complainant; that pending this suit it be restrained as aforesaid; and that, in the event the court should decline to grant the injunction prayed, the complainant be awarded full, just and adequate compensation for the lands so proposed to be taken and the rights, easements and franchises so proposed to be granted to the defendant. The bill prays for such other and further relief as the nature of the case might require.

The defendant appeared, and by its attorney offered to pay into the registry of the court the sum of $14,705.98, being double the amount of the award of the referees appointed to assess the damages for the right of way for the railroad through the plaintiff's territory

A demurrer to the bill was sustained. The prayer for an injunction was refused, a hearing on the question of damages was denied because of the misjoinder of equitable and legal causes of action, and the bill was dismissed for want of equity, without prejudice, and with judgment against the plaintiff for costs. 33 Fed. Rep. 900.

The plaintiff, as we have seen, seeks a decree setting aside and vacating the award of damages made by the referees, and perpetually enjoining the railway company from locating, operating and maintaining a railroad, telegraph and telephone line through its territory, as provided for in the act of July 4, 1884. Relief of that character is unquestionably of an equitable nature. But the plaintiff unites with this cause of action a prayer that if an injunction be refused, it may be awarded full, just and adequate compensation for the lands proposed to be taken by the railway company, and for the rights, easements and franchises assumed to be granted to it by Congress. The latter is a legal, as distinguished from an equitable, cause of action. "Whenever," this court said in *Van Norden* v. *Morton*, 99 U. S. 378, 380, "a new right is granted by statute, or a new remedy for violation of an old right, or whenever such rights and remedies are dependent on state statutes or acts of Congress, the jurisdiction of such cases, as between the law side and the equity side of the federal courts, must be determined by the essential character of the case, and unless it comes within some of the recognized heads of equitable jurisdiction it must be held to belong to the other." We do not doubt that a proceeding for an assessment of damages for the taking of private property for public use is one at law. It possesses none of the essential elements of a suit in equity, within the meaning of the statutes defining the jurisdiction of the courts of the United States. It was, therefore, properly held below that these two causes of action could not be united in the same suit in a court of the United States. *Hurt* v. *Hollingsworth*, 100 U. S. 100; *Buzard* v. *Houston*, 119 U. S. 347, 351.

But the court below ought not, for that reason, to have dismissed the plaintiff out of court, without making some pro-

vision, by appropriate orders, for the protection of its rights as against the railway company. Congress gave the Cherokee Nation, if dissatisfied with the allowances provided for in the above act, the right, within ninety days after the making of an award and notice of the same, "to appeal by original petition to the courts," and have a trial of the case *de novo*. It did not prescribe the form of the petition, nor indicate what it should contain. Yet, a petition of some kind was necessary in order to invest the court below with authority to take hold of the question of compensation to be made to the Cherokee Nation, and finally determine it without reference to the award of the commissioners. While, for the reasons above stated, the proceeding instituted by the plaintiff could not be regarded as technically a suit in equity, of which the court might take cognizance under the general statutes defining its jurisdiction, we perceive no reason why, in view of the broad terms of the act of Congress, and of the peculiar relations which the plaintiff sustains to the government and people of the United States — relations which forbid, if to be avoided, the application of strict rules of interpretation — the bill might not have been treated simply as an original petition of appeal by the plaintiff for a trial of the case between it and the railway company upon the issue as to damages. It was none the less a petition for appeal because relief of an equitable character was asked that could not be granted. The petition need not have been regarded as one to which the railway company must file a formal answer, but rather as the basis for such orders as would bring both parties into court for the determination of the question of damages. As the case is to be tried *de novo*, the court can properly make an order requiring the railway company to take the initiative by filing its written application or petition for an ascertainment of the compensation to be made for the property proposed to be taken or the damage that would be done by reason of the construction of the railway. To that petition when filed, the Cherokee Nation can demur, answer or plead, as they may be advised. Under issues thus made, or under some other mode of procedure devised by the court,

and appropriate for a regular trial of the issues, the case can be tried *de novo*, and all the questions of law and fact that either party chooses to raise be finally determined.

This mode of proceeding will result in a speedy determination of the matters really in dispute, and is conducive to the ends of justice. And we are the better satisfied with such a disposition of the controversy, because the equitable relief sought by the plaintiff cannot be granted. We have had some doubt as to whether, in the present attitude of the case, the reasons for this conclusion ought to be now given. But as the questions raised by the demurrer were elaborately examined by the court below, (33 Fed. Rep. 900,) and were fully discussed at the bar, and as the plaintiff ought not to be led to suppose that a new bill in equity, based upon the alleged invalidity of the act of July 4, 1884, would avail any good purpose, we have concluded to state the grounds upon which we hold that Congress, in the passage of that act, has not violated any rights belonging to the plaintiff.

No allegations are made in the bill that would justify a decree perpetually enjoining the railway company from proceeding under the act of Congress. The proposition that the Cherokee Nation is sovereign in the sense that the United States is sovereign, or in the sense that the several States are sovereign, and that that nation alone can exercise the power of eminent domain within its limits, finds no support in the numerous treaties with the Cherokee Indians, or in the decisions of this court, or in the acts of Congress defining the relations of that people with the United States. From the beginning of the government to the present time, they have been treated as "wards of the nation," "in a state of pupilage," "dependent political communities," holding such relations to the general government that they and their country, as declared by Chief Justice Marshall in *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17, "are considered by foreign nations, as well as by ourselves, as being so completely under the sovereignty and dominion of the United States, that any attempt to acquire their lands, or to form a political connection with them, would be considered by all as an invasion of our terri-

tory and an act of hostility." It is true, as declared in *Worcester* v. *Georgia*, 6 Pet. 515, 557, 569, that the treaties and laws of the United States contemplate the Indian Territory as completely separated from the States and the Cherokee Nations as a distinct community, and (in the language of Mr. Justice McLean in the same case, p. 583) that "in the executive, legislative and judicial branches of our government we have admitted, by the most solemn sanction, the existence of the Indians as a separate and distinct people, and as being vested with rights which constitute them a state or separate community." But that falls far short of saying that they are a sovereign State, with no superior within the limits of its territory. By the treaty of New Echota, 1835, the United States covenanted and agreed that the lands ceded to the Cherokee Nation should at no future time, without their consent, be included within the territorial limits or jurisdiction of any State or Territory, and that the government would secure to that nation "the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government of the persons and property within their own country, belonging to their people, or such persons as have connected themselves with them;" and, by the treaties of Washington, 1846 and 1866, the United States guaranteed to the Cherokees the title and possession of their lands, and jurisdiction over their country. Revision of Indian Treaties, pp. 65, 79, 85. But neither these nor any previous treaties evinced any intention, upon the part of the government, to discharge them from their condition of pupilage or dependency, and constitute them a separate, independent, sovereign people, with no superior within its limits. This is made clear by the decisions of this court, rendered since the cases already cited. In *United States* v. *Rogers*, 4 How. 567, 572, the court, referring to the locality in which a particular crime had been committed, said: "It is true that it is occupied by the tribe of Cherokee Indians. But it has been assigned to them by the United States as a place of domicil for the tribe, and they hold and occupy it with the assent of the United States, and under their authority. . . . We think it too firmly and clearly

established to admit of dispute that the Indian tribes, residing within the territorial limits of the United States, are subject to their authority." In *United States* v. *Kagama*, 118 U. S. 375, 379, the court, after observing that the Indians were within the geographical limits of the United States, said: "The soil and the people within these limits are under the political control of the government of the United States; or of the States of the Union. . There exist within the broad domain of sovereignty but these two. . . They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided. . . . . The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it has never existed anywhere else, because the theatre of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes." The latest utterance upon this general subject is in *Choctaw Nation* v. *United States*, 119 U. S. 1, 27, where the court, after stating that the United States is a sovereign nation limited only by its own Constitution, said: "On the other hand, the Choctaw Nation falls within the description in the terms of our Constitution, not of an independent State or sovereign nation, but of an Indian tribe. As such, it stands in a peculiar relation to the United States. It was capable under the terms of the Constitution of entering into treaty relations with the government of the United States, although, from the nature of the case, subject to the power and authority of the laws of the United States when Congress should choose, as it did determine in the act of March 3, 1871, embodied in section 2079 of the Revised Statutes, to exert its legislative power."

In view of these authorities, the contention that the lands

through which the defendant was authorized by Congress to construct its railway, are held by the Cherokees as a sovereign nation, without dependence on any other, and that the right of eminent domain within its territory can only be exercised by it, and not by the United States, except with the consent of the Cherokee Nation, cannot be sustained. The fact that the Cherokee Nation holds these lands in fee simple under patents from the United States, is of no consequence in the present discussion; for the United States may exercise the right of eminent domain, even within the limits of the several States, for purposes necessary to the execution of the powers granted to the general government by the Constitution. Such an authority, as was said in *Kohl* v. *United States*, 91 U. S. 367, is essential to the independent existence and perpetuity of the United States, and is not dependent upon the consent of the States. *United States* v. *Fox*, 94 U. S. 315, 320; *United States* v. *Jones*, 109 U. S. 513; *United States* v. *Great Falls Manufacturing Co.*, 112 U. S. 645; *Van Brocklin* v. *State of Tennessee*, 117 U. S. 151, 154. As was said by Mr. Justice Bradley in *Stockton* v. *Baltimore &c. Railroad*, 35 Fed. Rep. 9, 19: "The argument based upon the doctrine that the States have the eminent domain or highest dominion in the lands comprised within their limits, and that the United States have no dominion in such lands, cannot avail to frustrate the supremacy given by the Constitution to the government of the United States in all matters within the scope of its sovereignty. This is not a matter of words, but of things. If it is necessary that the United States government should have an eminent domain still higher than that of the State, in order that it may fully carry out the objects and purposes of the Constitution, then it has it. Whatever may be the necessities or conclusions of theoretical law as to eminent domain or anything else, it must be received as a postulate of the Constitution that the government of the United States is invested with full and complete power to execute and carry out its purposes." It would be very strange if the national government, in the execution of its rightful authority, could exercise the power of eminent domain in the several States, and could not exercise the same

power in a Territory occupied by an Indian nation or tribe, the members of which were wards of the United States, and directly subject to its political control. The lands in the Cherokee territory, like the lands held by private owners everywhere within the geographical limits of the United States, are held subject to the authority of the general government to take them for such objects as are germane to the execution of the powers granted to it; provided only, that they are not taken without just compensation being made to the owner.

But it is said that the objects for which the act of 1884 was passed are not such as admit of the exercise of the right of eminent domain. This contention is without merit. Congress has power to regulate commerce, not only with foreign nations and among the several States, but with the Indian tribes. It is not necessary that an act of Congress should express, in words, the purpose for which it was passed. The court will determine for itself whether the means employed by Congress have any relation to the powers granted by the Constitution. The railroad which the defendant was authorized to construct and maintain will have, if constructed and put into operation, direct relation to commerce with the Indian tribes, as well as with commerce among the States, especially with the States immediately north and south of the Indian Territory. It is true, that the company authorized to construct and maintain it is a corporation created by the laws of a State, but it is none the less a fit instrumentality to accomplish the public objects contemplated by the act of 1884. Other means might have been employed; but those designated in that act, although not indispensably necessary to accomplish the end in view, are appropriate and conducive to that end, and, therefore, within the power of Congress to adopt. The question is no longer an open one, as to whether a railroad is a public highway, established primarily for the convenience of the people, and to subserve public ends, and, therefore, subject to governmental control and regulation. It is because it is a public highway, and subject to such control, that the corporation by which it is constructed, and by which it is to be maintained, may be permitted, under legislative sanction, to appropriate private prop-

erty for the purposes of a right of way, upon making just compensation to the owner, in the mode prescribed by law. It is well said by Mr. Cooley, in his Treatise on Constitutional Limitations, section 537, that " while there are unquestionably some objections to compelling a citizen to surrender his property to a corporation, whose corporators, in receiving it, are influenced by motives of private gain and emolument, so that *to them* the purpose of the appropriation is altogether private, yet conceding it to be settled that these facilities for travel and commerce are a public necessity, if the legislature, reflecting the public sentiment, decide that this general benefit is better promoted by their construction through individuals or corporations than by the State itself, it would clearly be pressing a constitutional maxim to an absurd extreme if it were to be held that the public necessity should only be provided for in the way which is least consistent with the public interest." But this precise question was determined upon full consideration in *California* v. *Pacific Railroad Company*, 127 U. S. 1, 39, where this court said : " The power to construct, or to authorize individuals or corporations to construct, national highways and bridges from State to State, is essential to the complete control and regulation of interstate commerce. Without authority in Congress to establish and maintain such highways and bridges, it would be without authority to regulate one of the most important adjuncts of commerce. . . . Of course the authority of Congress over the Territories of the United States and its power to grant franchises exercisable therein are, and ever have been, undoubted. But the wider power was very freely exercised, and much to the general satisfaction, in the creation of the vast system of railroads connecting the East with the Pacific, traversing States as well as Territories, and employing the agency of State as well as federal corporations." Upon this point nothing more need be said.

It is further suggested that the act of Congress violates the Constitution in that it does not provide for compensation to be made to the plaintiff before the defendant entered upon these lands for the purpose of constructing its road over them.

This objection to the act cannot be sustained.   The Constitution declares that private property shall not be taken "for public use without just compensation."   It does not provide or require that compensation shall be actually paid in advance of the occupancy of the land to be taken.   But the owner is entitled to reasonable, certain and adequate provision for obtaining compensation before his occupancy is disturbed.   Whether a particular provision be sufficient to secure the compensation to which, under the Constitution, he is entitled, is sometimes a question of difficulty.   In the present case, the requirements of the Constitution have, in our judgment, been fully met. The third section provides that before the railway shall be constructed through any lands proposed to be taken, full compensation shall be made to the owner for all property to be taken or damage done by reason of the construction of the road.   In the event of an appeal from the finding of the referees, the company is required to pay into court double the amount of the award, to abide its judgment; and, that being done, the company may enter upon the property sought to be condemned, and proceed with the construction of its road. We are of the opinion that this provision is sufficiently reasonable, certain and adequate to secure the just compensation to which the owner is entitled.

The plaintiff asks, what will be its condition, as to compensation, if, upon the trial *de novo* of the question of damages, the amount assessed in its favor should exceed the sum which may be paid into court by the defendant?   This question would be more embarrassing than it is, if, by the terms of the act of Congress, the title to the property appropriated passed from the owner to the defendant, when the latter — having made the required deposit in court — is authorized to enter upon the land, pending the appeal, and to proceed in the construction of its road.   But, clearly, the title does not pass until compensation is actually made to the owner.   Within the meaning of the Constitution, the property, although entered upon, pending the appeal, is not taken until the compensation is ascertained in some legal mode, and, being paid, the title passes from the owner.   Such was the decision in *Kennedy*

v. *Indianapolis*, 103 U. S. 599, 604, where the court construed a clause of the constitution of Indiana, declaring that no man's property "shall be taken or applied to public use, . . . without a just compensation being made therefor" — substantially the provision found in the national Constitution. This court there said that "on principle and authority the rule is, under such a constitution as that of Indiana, that the right to enter on and use the property is complete as soon as the property is actually appropriated under the authority of law for a public use, but that the title does not pass from the owner without his consent until just compensation has been made to him." In the case now before us, the property in respect to which the referees made the award will be conditionally appropriated for the public use when the defendant makes a deposit in court of double the amount of such award, and it only remains to fix the just compensation to be made to the owner. But the title has not passed, and will not pass, until the plaintiff receives the compensation ultimately fixed by the trial *de novo* provided for in the statute. So that, if the result of that trial should be a judgment in its favor in excess of the amount paid into court, the defendant must pay off the judgment before it can acquire the title to the property entered upon, and failing to pay it within a reasonable time after the compensation is finally determined, it will become a trespasser, and liable to be proceeded against as such. And, in such case, if the plaintiff shall sustain damages by reason of the use of its property by the defendant pending the appeal, the latter will be liable therefor. The apprehension, therefore, that the plaintiff may lose its property without receiving just compensation therefor, is without foundation.

Some stress is laid upon the possibility that the defendant may become insolvent before the proceedings below reach a conclusion, and become unable to pay any damages in excess of the amount it may pay into court. The possibility of such insolvency is not, in our opinion, a sufficient ground for holding that the provision made in the act of Congress for securing just compensation is inadequate. Absolute certainty in such matters is impracticable, and, therefore, cannot reasonably be

required.   In determining the validity of the act of Congress, the presumption must be indulged that a deposit in court of double the amount awarded by three disinterested referees, appointed by the President, will amply secure the payment of any compensation that may be fixed at the trial in the court below.   The record states that the defendant offered to pay into court double the amount of the award made by the referees.   The offer to pay is not a compliance with the statute.   The amount required to be deposited must be actually paid into court before the company can rightfully enter upon the lands sought to be condemned, or proceed with the construction of its road.

*The decree is reversed, and the cause remanded for further proceedings in conformity with this opinion.*