**UNITED STATES of America,
Plaintiff,**

v.

**CONSOLIDATED WOUNDED KNEE
CASES, Defendants.**

**Nos. CR 73–5019 et al.**

United States District Court,
D. Nebraska and D. South
Dakota, W. D.
Jan. 17, 1975.

Duane L. Nelson, Sp. Asst. U. S. Atty., for plaintiff.

John Thorne, San Jose, Cal., for defendants.

URBOM, Chief Judge.

Approximately sixty-five defendants, charged criminally with acts allegedly done on the Pine Ridge Indian Reservation in the vicinity of Wounded Knee, South Dakota, during early 1973, have moved for dismissal for want of jurisdiction. The single claim is that "the Courts of the United States do not have the power and jurisdiction to judge the guilt or innocence of individuals who are citizens of other Nations for alleged crimes committed on the soil of other Nations . . . "[1] Permeating the position is the concept that the Sioux people are a fully sovereign nation, limited only by treaties made by it.

Following an eleven-day hearing, devoted in the main to the testimony of an impressive array of traditional Indians, historians, and anthropologists, the motion is now submitted for my consideration. From as objective and earnest an evaluation of the testimony, briefs, evidence and law as I can make, I conclude that the broad proposition advanced by the defendants cannot be accepted and that this court has jurisdiction over the pending charges.

The Sioux people[2] were once a fully sovereign nation. They are not now and have not been for a long time. Whether they ever will be again is dependent upon actions of the Congress and the President of the United States and not of the courts. There is a residue of sovereignty, however, a part of which reserves for the Sioux partial criminal jurisdiction. The remainder of this memorandum explains the conclusion and applies it to the pending cases.

### I.

The conclusion that Indian tribes do not have complete sovereignty is irresistible, if I am to follow an un-

---

1. Defendants' Memorandum of Points and Authorities, page 3.

2. Whether the several tribes or bands comprising the Great Sioux Nation were individ-

ually sovereign or whether the sovereignty lay with the collection of tribes is open to question.

broken line of decisions of the United States Supreme Court, extending from the early 19th century until the year before last. From Johnson v. McIntosh, 21 U.S. 240, 8 Wheat. 543, 5 L.Ed. 681 (1823) [3], to McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) [4], the repeated declaration has been unmistakable: Native American Indian nations, although occupiers of the land before whites knew of the land's existence, do not possess total sovereignty. Felix S. Cohen's Handbook of Federal Indian Law, perhaps the premier work on American Indian Law, accurately says at page 123:

> "The whole course of judicial decision on the nature of Indian tribal powers is marked by adherence to three fundamental principles: (1) An Indian tribe possesses, in the first instance, all the powers of any sovereign state. (2) Conquest renders the tribe subject to the legislative power of the United States and, in substance, terminates the external powers of sovereignty of the tribe, e. g., its power to enter into treaties with foreign nations, but does not by itself affect the internal sovereignty of the tribe, i. e., its powers of local self-government. (3) These powers are subject to qualification by treaties and by express legislation of Congress, but, save as thus expressly qualified, full powers of internal sovereignty are vested in the Indian tribes and their duly constituted organs of government."

Directly pertinent are United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886), which held that federal courts have jurisdiction over certain crimes committed in Indian country by virtue of an Act of Congress, the predecessor to the present Major Crimes Act found in 18 U.S.C. § 1153, and United States v. Rogers, 45 U.S. 632, 11 L.Ed. 1105 (1846), wherein Chief Justice Taney said:

> " . . . It is our duty to expound and execute the law as we find it, and we think it too firmly and clearly established to admit of dispute, that the Indian tribes residing within the territorial limits of the United States are

---

3. "The United States, then, have unequivocally acceded to that great and broad rule by which its civilized inhabitants now hold this country. They hold, and assert in themselves, the title by which it was acquired. They maintain, as all others have maintained, that discovery gave an exclusive right to extinguish the Indian title of occupancy, either by purchase or by conquest; and gave also a right to such a degree of sovereignty, as the circumstances of the people would allow them to exercise. . . .

"We will not enter into the controversy, whether agriculturists, merchants and manufacturers, have a right, on abstract principles, to expel hunters from the territory they possess, or to contract their limits. Conquest gives a title which the courts of the conqueror cannot deny, whatever the private and speculative opinions of individuals may be, respecting the original justice of the claim which has been successfully asserted. . . ." 21 U.S. at 259–260.

4. "The Indian sovereignty doctrine is relevant, then, not because it provides a definitive resolution of the issues in this suit, but because it provides a backdrop against which the applicable treaties and federal statutes must be read. It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government. Indians today are American citizens. They have the right to vote, to use state courts, and they receive some state services. But it is nonetheless still true, as it was in the last century, that '[t]he relation of the Indian tribes living within the borders of the United States . . . [is] an anomalous one and of a complex character. . . . They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.' United States v. Kagama, 118 U.S., at 381–382, 6 S.Ct. at 1112." 411 U.S. at 172–173, 93 S.Ct. at 1262.

subject to their authority, and where the country occupied by them is not within the limits of one of the states, Congress may by law punish any offence committed there, no matter whether the offender be a white man or an Indian. . . ." 45 U.S. at 638–9.

The essence of that pronouncement has been often repeated and has not been withdrawn.[5]

■■ Sufficient elements of sovereignty in Indian tribes have been recognized, however, to permit dealing with the tribes through treaties, and until 1871 that manner of dealing was the usual one.[6] Numerous treaties were effected between the United States and various tribes of the Sioux, including the Treaty of 1868,[7] which the defendants here rely upon as reserving to the Sioux Nation of Indians the right of self-government, including the function of punishing persons for offenses occurring on lands reserved for occupancy by members of that nation. An analysis of that treaty will be made later in this memorandum, but at this point it is to be observed only that a treaty is placed by the Constitution of the United States on no higher plane than an Act of Congress, so if a self-executing treaty and an Act of Congress be in conflict, the more recent governs. Whitney v. Robertson, 124 U.S. 190, 8 S.Ct. 456, 31 L. Ed. 386 (1888); The Head Money Cases, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884). An intention to alter a treaty by legislation is not to be imputed lightly but must be explicit. Menominee Tribe of Indians v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); Lone Wolf v. Hitchcock, 187 U. S. 553, 566, 23 S.Ct. 216, 47 L.Ed. 299 (1903); Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912). Jurisdiction is therefore not fixed alone by treaties, but by legislation also, and the 1868 Treaty has been modified in that regard in several important respects, as will be pointed out in later portions of this memorandum.

The defendants recognize that the developed law is squarely in opposition to their legal position here. They therefore attack that law and the reasoning behind it as being arrogant and unjust, insofar as it holds that sovereignty of an Indian tribe or nation may be diminished by anything except a treaty, and they ask that this court repudiate that law.

It cannot be denied that official policy of the United States until at least the late 19th century was impelled by a resolute will to control substantial territory for its westward-moving people. Whatever obstructed the movement, including the Indians, was to be—and was— shoved aside, dominated, or destroyed. Wars, disease, treaties pocked by duplicity, and decimation of the buffalo by whites drove the Sioux to reservations, shriveled their population and disemboweled their corporate body. They were left a people unwillingly dependent in fact upon the United States.

It is an ugly history. White Americans may retch at the recollection of it.

They may also ask themselves questions: How much of the sins of our forefathers must we rightly bear? What precisely do we do now? Shall we pre-

5. See Cherokee Nation v. Southern Kansas Railway Company, 135 U.S. 641, 10 S.Ct. 965, 34 L.Ed. 295 (1890); Talton v. Mayes, 163 U.S. 376, 384, 16 S.Ct. 986, 41 L.Ed. 196 (1896); United States v. Quiver, 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196 (1916).

6. The Act of March 3, 1871, c. 120, § 1, 16 Stat. 566, now 25 U.S.C. § 71, provides: "No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired."

7. Treaty with the Sioux—Brule, Oglala, Miniconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arcs, and Santee —and Arapaho, April 29, 1868, ratified February 16, 1869, 15 Stat. 635, and proclaimed February 24, 1869.

tend that history never was? Can we restore the disemboweled or push the waters of the river upstream to where they used to be?

Who is to decide? White Americans? The Native Americans? All, together? A federal judge?

Who speaks for the Sioux? Those traditional people who testified here? Those Sioux of a different mind who did not testify? The officials elected by the Sioux on the eight reservations?

Feeling what *was* wrong does not describe what *is* right. Anguish about yesterday does not alone make wise answers for tomorrow. Somehow, all the achings of the soul must coalesce and with the wisdom of the mind develop a single national policy for governmental action.

I feel no shirking of duty in saying that formulation of such a national policy should not be made by a federal judge or the handful who may review his decision on appeal. Four reasons press me to that conclusion.

First, a strength of the elective process is that the citizenry may choose those who mirror their thoughts, and an amalgam of many thus elected is more likely to reflect the conscience and wisdom of the people than a few who are appointed.

Second, legislative bodies have investigative tools for listening to a wider community than do courts for ferreting out the deeper consciousness of the body politic.

Third, relations with American Indians are rooted in international relations (and would pointedly be so governed if the defendants' position were adopted), including the laws of conquest and of

treaties developed over centuries, not by courts, but by executive heads of nations through negotiations. The United States in its early history accepted in its dealings with other nations the European concepts.[8] Perhaps it should not have done so in its relations with the American Indians. But it did. Changing now, after nearly two centuries, is a matter of massive public policy for broader exploration than courts are able to provide. Essentially, the issues here have to do with the methods of shifting power from one group to another—by war, threat of war, economic pressure or inducement, verbal persuasion, election, agreement, or gradual legislative encroachment. The acceptability of each method should be decided by the citizenry at large, which speaks directly or through its elected representatives.

Fourth, the people of the United States have not given me or any other judge the power to set national policy for them. By the Constitution the people have assigned governmental powers and have set their limits. Relations with Indian tribes are given exclusively to the executive and legislative branches.[9] Perhaps it should be otherwise, but it is not. When and if the people amend the Constitution to put limits on the executive and legislative branches in their affairs with Indian tribes, the federal courts will uphold those limits, but in the meantime the courts cannot create limits. In short, a judge must hold government to the standards of the nation's conscience once declared, but he cannot create the conscience or declare the standards.

The defendants, then, are addressing the wrong forum for gaining relief in their sovereignty grievances.[10]

8. Worcester v. Georgia, 31 U.S. 350, 368–369, 6 Peters 515, 543, 8 L.Ed. 483 (1832); *Johnson v. McIntosh, supra,* quoted in footnote 3.

9. Article I, Section 8, states: "The Congress shall have Power To . . . provide for the common Defence . . . of the United States . . . ." Article II, Section 2, provides: "He [the President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur . . . ." Article I, Section 8, states: "The Congress shall have Power . . . to regulate Commerce . . . with the Indian Tribes."

10. The Chinese Exclusion Case, 130 U.S. 581, 602, 9 S.Ct. 623, 32 L.Ed. 1068 (1889);

If it be thought that the Supreme Court nevertheless *did* decide the policy issues of Indian sovereignty in such decisions as United States v. Kagama, supra, and Worcester v. Georgia, 31 U.S. 350, 8 L.Ed. 483 (1832), even though it thought it was not, and therefore could again, it must be answered that if it' did, every lower federal court is bound by the pronouncement. When the Supreme Court speaks clearly, I must honor the statement or be as unfaithful to my duty to the law as the United States has been to its promises to the American Indians.

In the event the Supreme Court concludes that it can and should change the law regarding sovereignty of and treaties with Indian tribes, the record made in this hearing will assist in providing a basis. For example, one of the grounds of justification used by Chief Justice Marshall for reducing the sovereignty of the Indians was the assertion that the Indians were "fierce savages, whose occupation was war . . . ."[11] The record made here should go far to dispel that assertion. The Sioux, and undoubtedly many other tribes as well, had a highly developed governmental system, a religion proclaiming the sacredness of all nature and life, and a disposition toward peacefulness at least as effective as that of the white intruders.

It may also be that the hearing just concluded will serve to make the citizenry of the United States more aware and more willing to grapple with the hard decisions that need to be made. If nothing else, perhaps it can help us learn to listen.

In summary, the law is that Native American tribes do not have complete sovereignty, have no external sovereignty, and have only as much internal sovereignty as has not been relinquished by them by treaty or explicitly taken by Act of the United States Congress.

## II.

As to crimes by whites, the Treaty of 1868 provided in the second paragraph of Article I:

"If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained."

The words clearly imply a duty upon the United States to arrest and punish according to the laws of the United States any white person or other person subject to the authority of the United States suspected of wrongdoing against the Indians. Testimony at the present hearing varied, but the more persuasive was to the effect that Indian signatories considered it to be the duty of the United States under the treaty to take white offenders and punish them.[12] The wording of the treaty speaks only of wrongs "upon the person or property of the Indians" and says nothing at all of wrongs by whites against non-Indians. Although Indian treaties are to be interpreted, so far as possible, as Indians understood them, they "cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." Choctaw Nation of Indians v. United States, 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943). "The Indians" is ambigu-

United States v. Celestine, 215 U.S. 278, 290, 30 S.Ct. 93, 54 L.Ed. 195 (1909) ; Organized Village of Kake v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962) ; Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

11. Johnson v. McIntosh, 21 U.S. 240, 260, 8 Wheat. 543, 590, 5 L.Ed. 681 (1823).

12. Transcript, testimony of Vine DeLoria, Jr., pp. 200–203, and of Beatrice Medicine, p. 969.

ous and, construing it favorably for the Indians, it means signatory Indians—that is, members of a tribe who signed the treaty.

Jurisdiction, then, over a white committing a crime against a white or anyone else who was not a member of a tribe signatory to the Treaty of 1868 is simply not covered by the treaty. The treaty does recognize jurisdiction of the United States over crimes by whites or "other people subject to the authority of the United States" against signatory Indians.

### III.

As to crimes by Indians, the third paragraph of the Treaty of 1868 provides:

"If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith, the Indians herein named solemnly agree that they will, upon proof made to their agent and notice by him, deliver up the wrong-doer to the United States, to be tried and punished according to its laws; and in case they wilfully refuse so to do, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this or other treaties made with the United States . . . ."

Extensive evidence was offered at the hearing on the present motion regarding the Indians' understanding of that provision. This was in keeping with the rule that:

"Of course, treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties. (Citations omitted.) Especially is this true in interpreting treaties and agreements with the Indians; they are to be con-

strued, so far as possible, in the sense in which the Indians understood them, and 'in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.' (Citations omitted.)" Choctaw Nation of Indians v. United States, 318 U.S. 423, 431–32, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943).

The liberal application to Indian treaties is based upon the fact that the Indian people had no written language, were not familiar with forms of legal expression, and were a dependent people, so any doubtful expressions in them should be resolved in the Indians' favor. Nevertheless,

" . . . [T]his court does not possess any treaty-making power. That power belongs by the constitution to another department of the government; and to alter, amend or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be, on our part, an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty. Neither can this court supply a *casus omissus* in a treaty, any more than in a law. We are to find out the intention of the parties, by just rules of interpretation, applied to the subject-matter; and having found that, our duty is to follow it, so far as it goes, and to stop where that stops—whatever may be the imperfections or difficulties which it leaves behind." The Amiable Isabella, 19 U.S. 1, 32, 6 Wheat. 1, 70, 5 L.Ed. 191 (1821).

That same language was quoted by Mr. Justice Harlan in United States v. Choctaw Nation and Chickasaw Nation, 179 U.S. 494, 533, 21 S.Ct. 149, 45 L.Ed. 291 (1900), in relation to an Indian treaty. He also said at page 532, 21 S.Ct. at page 164:

" . . . It has never been held that the obvious, palpable meaning of the words of an Indian treaty may be disregarded because, in the opinion of the court, that meaning may in a par-

ticular transaction work what it would regard as injustice to the Indians." Thus it is only the ambiguities, if any, in the Treaty of 1868 which are to be construed at all, and those, of course, must be interpreted as the Indian signatories would have understood them and favorably to the Indians.

█ The words of the treaty are quite consistent with the prime testimony of the traditional Indians and historians who testified. If "bad men among the Indians" commit a wrong upon someone who is "subject to the authority of the United States," the signatory tribes agree to turn the bad men over to the United States for punishment according to the United States' laws. That declaration recognizes authority of the United States to punish persons who fall within its meaning. "Bad men among the Indians" is sufficiently ambiguous, however, to admit of an interpretation that limits it to Indian members of a signatory tribe. One "subject to the authority of the United States" clearly includes whites but may properly be construed not to include Indian members of a signatory tribe, because there is no clear indication that the signatory tribes admitted that their members were "subject to the authority of the United States." The result is that under the treaty an Indian member of a signatory tribe committing an offense against a white may properly be punished by the United States, but not so as to an Indian member of a signatory tribe committing a crime against another member of a signatory tribe.

This is consistent with much of the oral testimony. Beatrice Medicine testified that "bad men" in the Sioux culture means "people who do not behave properly according to the mores, so the signers of the treaty felt that they had within their power the ability to deal with their own people who fit the category of what is called bad men." [13] Many traditional Indians testified in effect that the oral history about the Treaty of 1868 was that the Sioux were to govern their own people. [14]

What the Sioux principally and naturally were interested in at the time of the signing of the treaty, as far as it touched government, was a leaving undiminished of their authority to punish their own. They accomplished this, at least as to crimes committed against other members of their own tribe. This is consistent, too, with the holding in Ex Parte Crow Dog, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883). Whether the tribes retained the exclusive right to punish members of their own tribe for

13. Transcript, p. 970.

14. Typical were these persons' testimony as to the oral history regarding the Treaty of 1868 as to government: Paul High Bear—"The chiefs and head men . . . were . . . supposed to govern the people . . . ." (Transcript, p. 1049); Marvin Thin Elk—"The great Sioux Nation will govern itself, will govern its people." (Transcript, p. 1056); Evelyn Gabe—"Our tribal system of government, our leaders, our chiefs, our head men" were to govern the Lakota people. (Transcript, pp. 1067–8); Alex Chasing Hawk—Under the treaty "the people will govern themselves." (Transcript, p. 1078); George Gap—The treaty meant that "they will govern themselves within the Sioux Nation." (Transcript, p. 1093); Winnie Red Shirt—"The Sioux people will govern themselves." (Transcript, p. 1096); Gladys Bissonette—"The sovereignty of the Lakota Nation meant that the Indians should govern their own nation"; "If he was an Indian then the Indians themselves within the nation would take it upon themselves to see what should be done." (Transcript, pp. 1106, 1108); Eugene White Hawk—"The Sioux people . . . will govern themselves." (Transcript, p. 1125); Alex One Star—"The Sioux people and their leaders . . . will govern themselves." (Transcript, p. 1135); Jackson Tail—"The Sioux people will govern themselves" and "Any crimes committed in Indian country the white people will take care of their own people and the Indians will take care of their own people." (Transcript, pp. 1140–1); Theda Nelson Pokrywka—"The people were to take care of themselves." (Transcript, p. 1145).

crimes against Indains who were not members of a signatory tribe I do not now decide, because it appears to me that none of the cases under consideration has that set of facts, unless it was charged under 18 U.S.C. § 1153 or the general criminal laws of the United States, which are analyzed in remaining parts of this memorandum.

The Act of Congress now found at 18 U.S.C. § 1152 provides for punishment by the United States for crimes applicable to federal enclaves, but specifically excludes from it offenses committed by one Indian against another and any case where a treaty reserves exclusive jurisdiction to the tribes. It obviously covers crimes by whites against Sioux, because the Treaty of 1868 does not retain for the Sioux exclusive jurisdiction over such offenses. Title 18, U.S.C. § 3231, gives jurisdiction over such crimes to the United States district courts.

 The Major Crimes Act, 18 U.S.C. § 1153, enumerates thirteen crimes which specifically are punishable by the United States if committed by an Indian against an Indian or anyone else. Title 18, U.S.C. § 3242, declares that the United States district courts have jurisdiction over the offenses enumerated in 18 U.S.C. § 1153. This is explicit legislation which overcomes the Treaty of 1868 regarding criminal jurisdiction and is a valid and constitutional law. United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886).[15]

### IV.

There remains the question of this court's jurisdiction under the Treaty of 1868 to try Indians accused of violating general federal criminal laws. This is a question of no small moment, since almost all the remaining indictments charge a violation of Title 18, U.S.C. § 231(a)(2) or (3), which is a statute that applies to anyone anywhere. I conclude that I have jurisdiction to try such indictments.

 Even if the Treaty of 1868 were interpreted to vest jurisdiction over such crimes in the Sioux people, the Congress of the United States in granting citizenship to all Indians has transferred such jurisdiction to the courts of the United States. The grant of citizenship was by Act of June 2, 1924, 43 Stat. 253, and is now contained in Title 8, U.S.C. § 1401(a)(2). On its face the statute does not explicitly apply general federal criminal laws to Indians while on Indian reservations. The statute, however, does contain a proviso which excepts application of the statute to any property rights of an Indian. This proviso can be reasonably construed as expressing an intention to impose all other obligations of citizenship, including conformity to the general federal criminal law. See Ex parte Green, 123 F.2d 862, 864 (C.A. 2nd Cir. 1941). This interpretation is supported by the legislative history of the Act. In the House debate on the Act Congressman Snyder, the chairman of the House Committee on Indian Affairs, in construing the effect of the legislation for his colleagues, stated:

> "And also it goes to this extent, it does not in any way change the right of the Indian to any tribal relation or any property he now holds. It does not affect that in any way, but simply makes him an American citizen, subject to all restrictions to which any other American citizen is subject, in any state." [16]

Such legislative history and the language of the statute itself are sufficient expression of a clear Congressional intent to abrogate or modify any treaty provisions to the contrary under the

---

15. This is reaffirmed in Keeble v. United States, 412 U.S. 205, 209, fn. 9, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973).

16. 65 Cong.Rec. 9303 (1924) (remarks of Congressman Snyder).

standards of Cook v. United States, 288 U.S. 102, 120, 53 S.Ct. 305, 77 L.Ed. 641 (1933); Pigeon River Co. v. Cox Co., 291 U.S. 138, 160, 54 S.Ct. 361, 78 L.Ed. 695 (1934); Menominee Tribe v. United States, 391 U.S. 404, 412–413, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); and United States v. White, 510 F.2d 448 (C.A. 8th Cir. 1974). Moreover, such an interpretation is consistent with the most recent Eighth Circuit consideration of the applicability of general federal criminal laws to Indians on Indian reservations. Stone v. United States, 506 F.2d 561 (C.A. 8th Cir. 1974), holds that general federal criminal laws are applicable to Indians on Indian reservations. Finally, such a holding reconciles whatever inconsistency there may appear to be between United States v. White, supra, and Stone v. United States, supra, since the general federal criminal statute involved in *White* restricts hunting rights of an Indian which he had by treaty with the United States. These hunting rights are clearly within the language of the proviso in the citizenship act and thus are not abrogated or modified by the grant of citizenship. The general federal statutes involved in *Stone* and those involved in the cases before me, however, do not concern rights in tribal property and thus are not within the proviso. Therefore, the federal courts have jurisdiction to try offenses against the United States by Indians on Indian reservations.

 It cannot be doubted that criminal laws apply to non-Indian citizens of the United States while on Indian reservations. Even if a reservation were considered a completely sovereign nation, the United States Congress has authority to make criminal laws binding its citizens while in that nation and the only question is one of the intention of Congress so to do. The rule is that legislation will be applied only "within the territorial jurisdiction of the United States," unless a contrary intent appears. Blackmer v. United States, 284 U.S. 421, 437, 52 S.Ct. 252, 254, 76 L.Ed.

375 (1932). I have no doubt that Congress never considered Indian reservations to be outside the territorial jurisdiction of the United States, nor has it been so considered by the courts, Cherokee Nation v. Southern Kansas Railway Company, 135 U.S. 641, 10 S.Ct. 965, 34 L.Ed. 295 (1890), and the rule of construction requiring an apparent intention to apply the law outside the territorial jurisdiction of the United States is not applicable. The opposite is true— the general criminal laws apply to Indian reservations unless a contrary intention appears.

 Other courts facing the question of whether general criminal laws apply on Indian reservations have concluded that they do. See Stone v. United States, 506 F.2d 561 (C.A. 8th Cir. 1974); Walks on Top v. United States, 372 F.2d 422 (C.A. 9th Cir.), cert. denied, 389 U.S. 879, 88 S.Ct. 109, 19 L.Ed. 2d 170 (1967); Head v. Hunter, 141 F. 2d 449 (C.A. 10th Cir. 1944).

The cases to which the present motion is directed fall, I believe, into one of the following categories:

1. Alleged crimes under 18 U.S.C. § 1152—

 a. By a white against a signatory Indian—which is a situation in which the Treaty of 1868 recognizes jurisdiction of the United States to punish;

 b. By a white against anyone who is not a signatory Indian—which is a situation in which jurisdiction is gained by the United States by the explicit legislation of Congress and not within the treaty exception of § 1152, because the Treaty of 1868 does not secure "exclusive" jurisdiction over such offenses to the Indian tribes, the treaty having failed to deal with the subject at all;

 c. By a signatory Indian against a white or against any other non-Indian who is "subject to the au-

thority of the United States," such as a Bureau of Indian Affairs policeman, an F.B.I. agent, or a United States marshal— which is a situation recognized by the Treaty of 1868 as being within the criminal jurisdiction of the United States;

d. By a nonsignatory Indian against a white or against any other non-Indian who is "subject to the authority of the United States," such as a Bureau of Indian Affairs policeman, an F.B.I. agent, or a United States marshal— which is a situation in which jurisdiction is gained by the United States by the explicit legislation of Congress and not within the treaty exception of § 1152, because the Treaty of 1868 does not secure "exclusive" jurisdiction over such offenses to the Indian tribes, the treaty having failed to deal with the subject at all.

2. Alleged crimes under 18 U.S.C. § 1153—

By Indians—which is a situation whereby the United States gained jurisdiction by explicit legislation, § 1153, thereby overcoming any provision in the Treaty of 1868 to the contrary.

3. Alleged crimes under the general criminal laws of the United States—

a. By Indians—which is a situation over which the United States obtained jurisdiction by the Act granting citizenship;

b. By non-Indian citizens, who are subject to all general criminal laws of the United States, whenever they are within the territorial jurisdiction of the United States, including Indian reservations.

For the reasons stated in this memorandum,

It hereby is ordered that the motion to dismiss for want of jurisdiction is denied.