MERCANTILE TRUST CO. et al. v. TEXAS & P. RY. CO. et al.

(Circuit Court, E. D. Louisiana.  December 15, 1908.)

No. 13,610.

1. COMMERCE (§ 3*)—ORGANIZATION—FEDERAL CORPORATION—ACT OF CONGRESS.

Under its power to regulate commerce, establish post roads, and provide such facilities as it may deem proper, and as military exigencies, when they arise, may require for the transportation of troops and munitions of war, Congress has power to charter a corporation to build and operate a railroad whereon interstate commerce may be conducted, and the mail, troops, and munitions of war may be transported, and for this purpose it is proper that such corporations be authorized to conduct the general business of a common carrier for its own purposes, in addition to serving the government.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 3; Dec. Dig. § 3.*]

2. COMMERCE (§ 46*)—FEDERAL CORPORATIONS—EXCLUSION FROM STATES.

Congress having incorporated an interstate railroad company to engage as a common carrier in interstate commerce, and also to serve the government by the transportation of mails, troops, and munitions of war, the states through which the railroad was located had no power to announce conditions for the noncompliance with which the corporation would be excluded from doing business in the state, and, hence Const. La., as amended (see Act No. 10 of Ex. Sess. 1907), providing that any federal, foreign, or nonresident corporation which should institute any suit, or action in, or remove the same to, any federal court within the state should be prohibited and denied the right to operate, conduct, or do any business within the state, and that thereafter any contract, agreement, engagement, or undertaking with or by such corporations should be null and void, was invalid as to such railroad company.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 100, 113, 126; Dec. Dig. § 46.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

216 F.—15

**3. CONSTITUTIONAL LAW (§ 303*)—DUE PROCESS OF LAW—DRASTIC AND IN-. ORDINATE PUNISHMENTS.**

Const. La., as amended (see Act No. 10 of Ex. Sess. 1907), provides that any foreign, federal, or nonresident corporation doing business within the state which should institute any suit or action in any other court or courts than those created and organized under the Constitution and laws of the state, or which should remove any suit to any other court or courts than those created under such laws, should be barred of the right to conduct any business within the state, and thereafter all contracts by or with such corporations should be void; also that any person acting as agent, servant, or officer of such corporation, who should make, or attempt to make, any contract for, with, by, or for its benefit after it had violated such provision, should be guilty of a misdemeanor, and on conviction should be fined not less than $100 nor more than $1000, and might also be imprisoned with or without hard labor, for not more than 12 months, or both at the discretion of the court. *Held*, that the penalties for disobeying such provision were so extreme that foreign corporations would generally be deterred from litigating the question of the right of the state to enact such amendment, and, as to a federal railroad company operating within the state, it was violative of the fourteenth amendment of the federal Constitution, as depriving the company of its property without due process of law.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 863–866; Dec. Dig. § 303.*]

In Equity. Suit by the Mercantile Trust Company and others against the Texas & Pacific Railway Company and others. Bill dismissed.

Alexander & Green, of New York City, and Foster, Milling & Godchaux, of New Orleans, La., for complainants.

Howe, Fenner, Spencer & Cocke, of New Orleans, La., for defendants.

SAUNDERS, District Judge. I. On October 23, 1907, Hon. Newton C. Blanchard, then Governor of the state of Louisiana, issued his proclamation, convening the General Assembly of the state of Louisiana in extraordinary session, to be held from November 11, 1907, to December 10, 1907, in order to consider and take action on particular matters specified in the proclamation. Soon thereafter Gov. Blanchard went out of the state of Louisiana, and, during his absence, Hon. J. Y. Sanders, then Lieutenant Governor of the state, and, as such, exercising the powers and functions of the Governor during the absence of the latter, issued his proclamation, wherein he designated other and additional matters to be acted upon by the General Assembly in the extraordinary session convened by Gov. Blanchard. In his proclamation, Lieut. Gov. Sanders, after reciting the calling of the extraordinary session by Gov. Blanchard, the absence of the Governor from the state, and the fact that he, Lieut. Gov. Sanders, exercised the powers and duties of the Governor during his absence, went on to declare:

"Therefore, I, Jared Y. Sanders, Lieutenant Governor and Acting Governor of the State of Louisiana, do hereby, by virtue of the authority in me vested by the Constitution and laws of the state of Louisiana, issue this, my procla-

mation, designating the following as additional objects to be considered in said extraordinary session, as follows, to wit: * * *

"2. To provide that any foreign or federal corporation doing business in the state of Louisiana which shall institute any suit or any action at law or in equity against the state of Louisiana, or any of its political subdivisions, or against any citizen of this state, in any other than a court organized and constituted under the laws of this state; or who being sued by the state, or by any of its political subdivisions, or by any citizen of this state, shall remove or petition to remove such suit into a federal court, shall be debarred and prevented from doing or conducting any business in this state."

The General Assembly convened pursuant to the above proclamation of Gov. Blanchard, at its extraordinary session, on November 25, 1907, passed an act No. 10 proposing to amend the Constitution of Louisiana by adopting, as a portion of that instrument, the following amendment:

"Any foreign, federal or nonresident corporation, operating, conducting or doing business in this state which shall institute any suit or action at law or in equity against the state of Louisiana, or any of its political subdivisions, or any of its public officers, or against any corporation or citizen of this state, in any other court or courts than such as may be created and organized under the Constitution and laws of this state, or which when sued by the state or any of its political subdivisions, or any of its public officers, or any corporation or citizen of this state, shall remove, or petition, or move to remove said suit to any other court than a court created and organized under the laws of this state, shall by this fact alone be debarred, prohibited and denied the right to operate, conduct, or do any business within this state and thereafter any contract, or agreement, engagement or undertaking with, or by, or to said corporation shall be utterly null and void.

"Any foreign, federal or nonresident corporation, or any person acting as agent, servant or officer of such corporation who shall make or attempt to make any contract, agreement, undertaking or engagement for, with, by or in the name of, for the use and benefit of such corporation, after the said corporation shall have violated any of the provisions of the foregoing paragraph, shall be guilty of a misdemeanor, and on conviction shall be fined not less than one hundred dollars, nor more than one thousand dollars, and may also be imprisoned with or without hard labor for not more than twelve months, or both, at the discretion of the court; provided, that it is not intended hereby to interfere with or prohibit the transaction of interstate business authorized under the laws and Constitution of the United States."

The proposed amendment was voted on and adopted by the vote of the people, on April 21, 1908.

II. The Texas & Pacific Railway Company is a corporation created by and existing under and by virtue of the laws of the United States of America, to wit, an act of Congress, approved March 3, 1871 (Act March 3, 1871, c. 122, 16 Stat. 573) and acts of Congress amendatory thereof and supplemental thereto. It owns and operates a line of railroad extending from the city of New Orleans, in the state of Louisiana, through the states of Louisiana and Texas to El Paso, in the state of Texas, together with several branch lines connected therewith in the states of Louisiana and Texas and Arkansas. The Texas & Pacific Railway is declared, by the act of March 3, 1871, creating it, to be a military and post road and organized for the purpose of insuring the carrying of the mails, troops, munitions of war, supplies, and stores of the United States. It has either constructed or acquired, in the state of Louisiana, 347 miles of main line railroad, and about 363

miles of branch line railroads, at a cost of many millions of dollars, and this property has been continuously used since its construction or acquisition for the purposes of interstate, foreign, and intrastate commerce in the transportation of persons and merchandise between points in the state of Louisiana and points in other states of the United States, and foreign countries, and in the transportation of the military forces, supplies, and mails of the United States. Said railway company has been, for many years past, and is now, under contract with the United States government for the transportation of mails and postal matter of the United States between all points on its line, and is constantly engaged in the transportation, for the United States government, of supplies and munitions and men in the service of the United States between points wholly within the state of Louisiana.

III. On June 29, 1875, by act before J. G. Eustis, notary public, the New Orleans Pacific Railway Company was organized, under the general incorporation laws of the state of Louisiana, for the purpose of constructing a railroad from New Orleans, La., to Marshall, or Dallas, Tex. Under this charter, the New Orleans Pacific Railway Company did actually construct a part of the projected railroad from New Orleans to Marshall. On February, 19, 1876, the General Assembly of the state of Louisiana passed an act entitled "An act to confirm the notarial charter of the New Orleans Pacific Railway Company, with amendments thereto to extend the term of existence of said company, and to confer thereon certain powers and franchises." Act No. 14 of 1876. By this act the term of the charter was made perpetual instead of being limited to 25 years, and the right of way was given it over all public lands, and the right to expropriate a right of way not exceeding 100 feet on each side of the center line of its track. On February 5, 1878, the General Assembly passed an act granting still further privileges to the New Orleans Pacific Railway Company. On June 20, 1881, the Texas & Pacific Railway Company purchased all the property, franchises, rights, and privileges of the New Orleans Pacific Railway Company, and then completed the line begun by the latter company, from the point it had reached in Louisiana, to Marshall, Tex., all of which was done under the authority of the statutes of the state of Louisiana.

IV. After the adoption of the constitutional amendment above referred to, the executive committee of the board of directors of the Texas & Pacific Railway Company at a meeting held October 6, 1908, passed the following resolution:

"Resolved, that the officers of the legal department of this company in Louisiana be instructed and directed by the president to disregard and not observe the prohibition against the institution of suits in or removal of suits to the federal court brought by or against this company in the state of Louisiana, but on the contrary that they be directed to institute in, or remove to, the federal courts such suits and actions brought by or against this company as they may deem proper."

V. The Mercantile Trust Company, the complainant in this case, is trustee under an act of mortgage, or deed of trust, executed by the Texas & Pacific Railway Company on February 1, 1888, for the purpose of securing a certain issue of the bonds of the Texas & Pacific

Railway Company, known as its second mortgage bonds, to the amount in the aggregate of principal thereof, $25,000,000, all of which have been duly issued, and are now outstanding in the hands of holders thereof for value. This deed of trust contains a stipulation, that:

"The Texas & Pacific Railway Company, in consideration of the premises, covenants, promises, and agrees:   *   *   *

"III. That having possession, as aforesaid, it shall and will diligently preserve all the rights and franchises to it granted and upon it conferred by the acts of Congress appertaining to the railway property and premises subject to the lien hereof and otherwise, and whenever necessary or advisable comply with the laws of any state wherein the routes aforesaid, or any it may hereafter acquire the right to construct its road on or any part thereof, may now or shall at any time hereafter be situate, in such manner and form as counsel learned in the law shall advise, with a view to effectually preserve, obtain, or secure the corporate rights and franchises, enabling it to locate, construct, use, operate, and maintain the said railway line or lines whereon these presents shall constitute a lien throughout the whole extent thereof."

Under this stipulation, and by virtue of the powers vested in it, as trustee, the Mercantile Trust Company files this bill seeking to enjoin the Texas & Pacific Railway Company and its legal officers in Louisiana from obeying the said resolution of the executive committee of the board of directors passed on October 6, 1908, and hereinabove cited. The bill avers that as soon as the trustee heard of this resolution of the executive committee, it demanded that it be rescinded and annulled, but that the railway company and its executive committee have refused to rescind and annul the resolution, and will proceed to carry it out unless enjoined. The bill avers that it is the duty of the company to obey the constitutional amendment regarding the bringing of suits in, and the removal of suits to, the federal courts in Louisiana. The bill avers that the action of the railway company and its executive committee in adopting the above-mentioned resolution is a violation of the express covenants of the said above-mentioned mortgage, or deed of trust, which will injuriously affect the mortgage rights which it is complainant's duty to protect.

VI. The defendant has filed an answer in which the facts averred in the bill are admitted, but the defendant insists that the constitutional amendment was, and is, illegal and void: First, because it was not adopted in the way prescribed by the existing Constitution of Louisiana for the adoption of amendments to that Constitution; second, because even if legally adopted, it would be void as being in conflict with the Constitution of the United States (1) in attempting to exclude the defendant, a federal corporation, from Louisiana if defendant exercised its rights under the Constitution of the United States, and (2) because the provisions of the constitutional amendment would violate the fourteenth amendment by depriving defendant of its property without due process of law.

I shall first consider the objection to the Louisiana constitutional amendment on the ground of its alleged repugnancy to the federal Constitution.

i. Defendant's first contention is that the amendment is void because it undertakes, in effect, to exclude a federal corporation from

the state of Louisiana if that corporation shall attempt to exercise rights secured to it by the Constitution and laws of the United States.

[1] It is now settled, beyond controversy, that, under the powers to regulate interstate commerce, to establish post roads, and to provide such facilities as it may deem proper, and as military exigencies, when they arise, may require for the transportation of troops and munitions of war, Congress has the power to charter and organize a corporation for the purpose of building and operating a railroad whereon interstate commerce may be conducted, and the mail, and troops, and munitions of war may be transported. See California v. Pacific R. R. Co., 127 U. S. at page 39, 8 Sup. Ct. 1073, 32 L. Ed. 150; Cherokee Nation v. Kansas Ry. Co., 135 U. S. at page 658, 10 Sup. Ct. 965, 34 L. Ed. 295; and Luxton v. North River Bridge Co., 153 U. S. at page 533, 14 Sup. Ct. 891, 38 L. Ed. 808.

In the exercise of this power, Congress incorporated the Texas & Pacific Railroad Company by an act approved March 3, 1871. 16 U. S. Stat. at Large, at page 573. Section 19 of this act declares:

"That the Texas Pacific Railroad Company shall be, and it is hereby, declared to be a military and post road; and for the purpose of insuring the carrying the mails, troops, munitions of war, supplies, and stores of the United States, no act of the company nor any law of any state or territory shall impede, delay, or prevent the said company from performing its obligations to the United States in that regard: Provided, that said road shall be subject to the use of the United States for postal, military, and all other governmental services, at fair and reasonable rates of compensation, not to exceed the price paid by private parties for the same kind of service, and the government shall at all times have the preference in the use of the same for the purpose aforesaid."

The act makes a land grant to aid in the construction of the railroad, and grants the company the right of way through public lands of the United States. And section 4 gives it the right to purchase any other railroad company, or to consolidate with it, whether chartered by Congress or under state law. And section 5 gives it the right to make running arrangements with any other railroad company.

Congress has therefore adopted the defendant company as an agency, or instrumentality, in carrying out the powers vested in Congress. The agency thus adopted by Congress is the agency of a common carrier, and it employs that agency as an entirety, and not merely to render those services, and those services only, which are directly and exclusively required in the execution of the powers vested in Congress. The services which Congress proposes to obtain, by means of the railroad, cannot be economically and efficiently obtained unless the railroad is vested with power, not only to perform the peculiar services required by the government, but also to engage in the general business of a common carrier. Congress has therefore made use, not merely of the railroad, but of the railroad as a common carrier, in all the branches of the business of a common carrier, for its own purposes.

The situation is exactly analogous to the case of the incorporation and employment of banks by Congress for more conveniently carrying on the financial operations of the government. It is possible to conceive that the government might have formed a corporation whose

operations would have been limited to the business of the government; but, while it is conceivable that this might have been done, it would have been done at great expense and great inconvenience. Congress, therefore, determined to employ the agency of a bank which was not only to aid the government in its financial operations, but also to carry on all the business of banking, and it was held that this could be validly done in the case of Osborn v. Bank, 9 Wheat. 740, 6 L. Ed. 204, and in McCulloch v. Maryland, 4 Wheat. 314, 4 L. Ed. 579.

[2] It is clear that when Congress has the power, under the federal Constitution, to adopt and use, for the convenience of the operations of the federal government, a corporation of any kind as its agency, in such case a state Legislature cannot, in any manner, interfere with the operations of such agency so employed by Congress for federal governmental purposes. The states cannot deny to these federal corporations the right to enter the states, or do business in the states. Neither can they announce conditions for noncompliance with which the federal corporations will be excluded from the states. And it is inconceivable that the state could exclude from their borders the federal corporations used as government agencies when those corporations decline to surrender their right to litigate in the federal courts.

I am clear, therefore, that the constitutional amendment is invalid and without effect as to the Texas & Pacific Railway Company.

[3] 2. It is further urged that the Louisiana constitutional amendment violates the provisions of the fourteenth amendment of the federal Constitution, in that it would, if enforced, deprive the railroad companies of their property without due process of law. The constitutional amendment provides that where any federal or foreign corporation brings a suit in the federal court, or removes a suit against it from the state court to the federal court, then—

"by this fact alone be debarred, prohibited and denied the right to operate, conduct, or do any business within this state and thereafter any contract, or agreement, engagement or undertaking with, or by, or to said corporation shall be utterly null and void."

It is further provided that if any federal or foreign corporation violates the amendment by bringing, or removing, suits in or into the federal court, then any agent, servant, or officer of such corporation who shall thereafter—

"make or attempt to make any contract, agreement, undertaking or engagement for, with, by or in the name of, or for the use and benefit of such corporation, after the said corporation shall have violated any of the provisions of the foregoing paragraph, shall be guilty of a misdemeanor, and on conviction shall be fined not less than one hundred dollars, nor more than one thousand dollars, and may also be imprisoned with or without hard labor for not more than twelve months, or both, at the discretion of the court."

The penalties thus denounced against corporations which violate the constitutional amendment are so drastic that they would involve the immediate and certain ruin of the corporation. The defendant in this case is a common carrier, and its very existence depends upon its power to make contracts from day to day. It sells thousands of railroad tickets to passengers every day that it exists and carries on busi-

ness. It issues every day thousands of bills of lading for freight received for transportation. Both the tickets and the bills of lading are contracts between the carrier and its customers. Under the constitutional amendment, not only are these contracts to be void, but the officers or agents of the company who make them are liable to be fined. $1,000 and to be imprisoned for 12 months for making them.

The penalties for disobeying the constitutional amendment are so extreme that the railroad companies and foreign corporations generally will probably be deterred from litigating the question of the right of the state to enact any such amendment. This, however, is a very serious question, and one which can and ought to be passed upon by the courts. The situation seems to be precisely that which the Supreme Court passed upon in Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764. The Supreme Court there dealt with a state statute which imposed penalties so excessive that the parties affected would naturally be deterred from testing the validity of the statute, and the court held:

"A state railroad rate statute which imposes such excessive penalties that parties affected are deterred from testing its validity in the courts denies the carrier the equal protection of the law without regard to the question of insufficiency of the rates prescribed."

They further held that:

"While there is no rule permitting a person to disobey a statute with impunity at least once for the purpose of testing its validity, where such validity can only be determined by judicial investigation and construction, a provision in the statute which imposes such severe penalties for disobedience of its provisions as to intimidate the parties affected thereby from resorting to the courts to test its validity practically prohibits those parties from seeking such judicial construction, and denies them the equal protection of the law."

I think this decision is conclusive of the contention that the constitutional amendment violates the fourteenth amendment, because it seeks to impose upon federal and foreign corporations that violate its provisions penalties so extreme and so ruinous that the only conclusion that a court can possibly draw is that it was the intention of the Legislature to deter federal and foreign corporations from instituting any proceeding to test the validity of the amendment. For it is obvious that if the penalties and consequences provided by the amendment could be inflicted, no corporation would ever dare to test the validity of this amendment. I am therefore bound to hold the constitutional amendment void because it violates the fourteenth amendment.

Having reached these conclusions I find it unnecessary to pass upon the alleged irregularity, under the state Constitution, in the steps whereby the constitutional amendment was adopted.

For the reasons assigned, the prayer of the petition must be denied and the bill dismissed at complainant's costs.