## TINKER v. McLAUGHLIN-FARRAR CO.

No. 1690.   Opinion Filed May 14, 1912.

(124 Pac. 296.)

**INDIANS—Contracts—Statutory Provisions.** Under the section of the act of Congress of March 3, 1901, c. 832, 31 Stat. 1065, regulating licensed traders, and their intercourse with the Osage Indians, the licensed traders could extend credit to an individual Osage, or the head of a family, to the extent only of 60 per cent. of his next quarterly annuity payment; and credit extended by such licensed traders to such Osage Indians, in March and August, 1905, in excess thereof, was unlawful and does not create a legal indebtedness against such Indians that can be enforced in the courts.

(Syllabus by Brewer, C.)

*Error from Osage County Court;*
*C. T. Bennett, Judge.*

Action by the McLaughlin-Farrar Company against George E. Tinker. Judgment for plaintiff, and defendant brings error. Reversed and dismissed.

*Boone & MacDonald,* for plaintiff in error.

*T. J. Leahy* and *Grinstead, Mason & Scott,* for defendant in error.

Opinion by BREWER, C.   This suit on certain promissory notes was filed in Osage county court September 10, 1909, by the defendant in error as plaintiff, against plaintiff in error as defendant. We will refer to the parties as they were known in the trial court. Plaintiff, a corporation, was at all times mentioned in the suit a licensed trader, under the laws of the United States, with the Osage Indians; its place of business being in the Osage Indian country. The defendant is, and has been all his life, an enrolled member of the Osage band or tribe of Indians. The execution of the notes is admitted. The defense is that plaintiff, as a licensed trader, sold from time to time to defendant,

goods, wares, and merchandise, in excess of 60 per cent. of the quarterly annuity payments due defendant, as the head of an Osage family, making ticket charges of such excess, and that such items formed the consideration for the notes, and that plaintiff, in so extending credit to defendant, violated the law, to the extent of such excess, and that the same was not collectible, but was void, and the notes based thereon were illegal and unenforceable, because founded on an illegal consideration.

This case involves the consideration and construction of an act of Congress specially applicable to the Osage Indians, same being part of the Indian Appropriation Act, passed March 3, 1901 (31 Stat. 1065, c. 832), and in aid of the construction to be placed on the part of the act specially involved, even at the expense of brevity, we quote liberally from the act:

"That the Secretary of the Interior is hereby authorized and directed to examine the accounts of Indian traders with the Osage Indians at the Osage Agency, and to determine the sums equitably due to such traders from such Indians, and to adjust their accounts upon the basis of a fair profit upon the goods which have been sold by such traders to such Indians, and when the amounts due as aforesaid shall have been determined and adjusted, the Secretary of the Interior is hereby authorized to pay by a disbursing officer selected by the Secretary for that purpose, to the Osage Indians per capita the amount which has been collected as rent of pasture lands, and any accumulated interest other than their regular annuities which has not been heretofore paid to them: Provided, that when it shall appear to such disbursing officer that any such Indian, either as an individual or as the head of a family, is indebted to a trader or traders at such agency, as the same shall have been determined and adjusted, in an amount equal to or exceeding said per capita payment, such disbursing officer shall pay the per capita share due to said Indian as an individual or the head of a family, to such trader or traders in discharge of, or to be applied upon such indebtedness to such trader or traders. If such Indian as an individual or head of a family shall be indebted to more than one of such traders, such payment of his per capita share shall be paid to the traders in proportion to the amount of the respective sums due them as determined and adjusted. If the per capita share of any such Indian as an individual or head of a family shall exceed his indebtedness to said trader or traders, then pay-

ment shall be made as aforesaid to such trader or traders of the amount due, as aforesaid, and the balance of such per capita payment shall be paid to said Indian: And provided further, that it shall be unlawful hereafter for the traders upon the Osage Indian Reservation to give credit to any individual Indian or head of a family to an amount greater than sixty per centum of the next quarterly annuity to which such individual Indian or head of a family will be entitled; and if such traders shall give credit to any individual Indian or head of a family upon such reservation in excess of the amount herein allowed, no portion of the indebtedness thus created shall be collectible, and the same shall be void and the licenses of such traders shall be revoked. And provided further, that on and after July first, nineteen hundred and one, any person desiring to trade with the Indians on said reservation shall, upon establishing the fact, to the satisfaction of the Commissioner of Indian Affairs, that he is a proper person to engage in such trade, be permitted to do so under such rules and regulations as the Commissioner of Indian Affairs may prescribe for the protection of said Indians."

The notes in suit were dated March 17 and August 21, 1905, respectively, and were executed to cover items of goods sold defendant during the first half of the year 1905. On September 15, 1904, an annuity card was issued defendant, for the following quarter (three months), in the sum of $287. That plaintiff extended a credit on said card, in the sum of $174.95, which was held out of defendant's annuity and paid plaintiff. That on December 15, 1904, an annuity card was issued defendant for the following three months in the sum of $287. That the plaintiff extended no credit on this card, and the court refused to let defendant prove that a credit had been allowed on it by others than plaintiff. That on March 15, 1905, an annuity card was issued defendant, for the three months following, in the sum of $287. That plaintiff extended no credit on this card, but the First National Bank did extend and collect on it the sum of $172.20. That on June 15, 1905, an annuity card was issued defendant for the three months following, in the sum of $322. That plaintiff extended no credit on this card, but that the First National Bank did extend and collect on it the sum of $182.20. It is thus conclusively shown that during the quarterly periods

the goods were sold by plaintiff, and to cover the price of which these notes were given, while plaintiff did not charge these credit sales against the annuity cards, yet the full amount (60 per cent.) possible to charge against the cards was advanced and credited against them by the First National Bank. Plaintiff's position is that, so long as it extended no credit on the cards at all, it had a right to extend any amount of credit to defendant on the strength of his other resources; and that, although such indebtedness would not be collected through the Indian Office, yet still it would be collectible through execution on any property of defendant, outside of trust property.

We do not think this contention sound. The act does not mean that each trader can extend credit to the amount of 60 per cent. This would be nonsense. It says the "traders" shall not (evidently in the aggregate) extend more than this amount of credit. The full credit that could be extended to this defendant under the law had been extended by the bank, and had been retained out of his annuity by the Indian office and paid to the bank. We do not know whether the bank dealt with these Indians as a licensed trader or not; however, it dealt in the same manner, extended the credit on his card, and the Indian Department treated it as a trader and paid its claim as though it was one. The traders had the right to demand the card, and use the credits already advanced on it as a guide as to how far they could go. This the plaintiff did not do; he credited the defendant, contrary to the law, and trusted him to pay what the law cannot compel him to pay, and which he refuses to pay.

The plaintiff introduced the local United States Indian Trade Supervisor, who testified, orally, to the effect that the department construed this law to permit traders to extend unlimited credit to Osages, on the strength of their other resources, at the trader's risk, but that such credit accounts would not be collected through the Indian Department. While the Interior Department was given power to prescribe all necessary rules and regulations relative to the conduct of the business of the licensed traders with these Indians, it has no authority to annul

a positive statute of the United States, prohibiting such credit dealings.

That Congress has plenary power in dealing with Indians and their estates cannot be doubted. That Congress had the right to pass the act under consideration is not disputed.

"The Indians and the territory which may have been specially set apart for their use are subject to the jurisdiction of the United States, and Congress may pass such laws as it sees fit prescribing the rules governing the intercourse of the Indians with one another and with citizens of the United States, and also the courts in which all controversies to which an Indian may be a party shall be submitted. *United States v. Rogers,* 4 How. 567, 11 L. Ed. 1105; *United States v. Kagama,* 118 U. S. 375 [6 Sup. Ct. 1109] 30 L. Ed. 228; *Gon-Shay-ee, Petitioner,* 130 U. S. 343 [9 Sup. Ct. 542] 32 L. Ed. 973; *Cherokee Nation v. Southern Kansas R. Co.,* 135 U. S. 641 [10 Sup. Ct. 965] 34 L. Ed. 295; *Roff v. Burney,* 168 U. S. 218, 221 [18 Sup. Ct. 60] 42 L. Ed. 442."

We do not think the meaning of the act, or the intention of Congress, is in doubt. When this act was passed, the licensed traders in the Osage Nation were claiming a very large sum of money, in the aggregate, from the individual members of the tribe. This is common knowledge in that country, and is shown by public documents. Prior to the passage of this act, it appears there was no provision for collecting through the Indian office the debts due from Osages. This act provides for adjusting, according to the equity of each claim, the claims of these licensed traders against the Osages. Then, after providing for such equitable settlement of the prior claims, Congress in very plain language told the traders that this custom of extending credit to these Indians must cease; that hereafter they could extend credit to the extent of 60 per cent. of the next quarterly annuity; and that any further or other credit would be "unlawful," and *"no portion of the indebtedness thus created shall be collectible,"* and *"the same shall be void,"* and *"the licenses of such traders shall be revoked."* These Indians did not even enjoy the advanced status of the Five Civilized Tribes; they were the wards of the government in the strict sense of the

word as used regarding the relation between the government and reservation Indians. The government was under the duty to care for, foster, and protect these Indians, morally, socially, and financially; to discourage extravagance and improvidence which would lead them into indebtedness they could not discharge; to encourage thrift and frugality which is so essential to the well-being of individuals. These licensed traders, in so far as their business was concerned, were creatures of the government, operating under its laws and the rules and regulations of one of its departments. They enjoyed a special privilege amounting, under the law, to a monopoly in this trade. The government had the right to erect this protecting barrier around the credit of these Indians, and say to the traders, "Thus far, and no further, shalt thou go." It has done so in language too plain to need any scholarly interpretation. The object was to protect the Indian; the trader knew the law, took his chance, and if he loses he cannot complain.

There are no authorities cited, or known to us, directly in point. The case of *Tinker v. Midland Valley Mercantile Co.,* 25 Okla. 160, 105 Pac. 333, while it involved the same statute, was affirmed on the ground that the burden of proof was on defendant in the lower court to show that the subject of the action was illegal under the statute and that there was no proof to that effect. The statute was not construed. Neither is the case of *Clement De Noya v. Hill Investment Co.* (filed May 12, 1909, and in which motion for rehearing is pending), in point here, as the debt involved in that case was created prior to the act in question here.

For the reasons given, this cause should be reversed and dismissed.

By the Court: It is so ordered.